**CLIFTON POWER CORPORATION,**
**Petitioner,**

v.

**FEDERAL ENERGY REGULATORY**
**COMMISSION, Respondent.**

**Nos. 94–1775, 95–1220 and 95–1257.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 29, 1996.

Decided July 23, 1996.

Carolyn Elefant, Washington, DC, with whom Paul V. Nolan was on the briefs, argued the cause for petitioner.

Katherine Waldbauer, Attorney, Federal Energy Regulatory Commission, with whom Jerome M. Feit, Solicitor, and Joseph S. Davies, Deputy Solicitor, were on the brief, Washington, DC, argued the cause for respondent.

Before: WALD, WILLIAMS, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

The Federal Energy Regulatory Commission assessed a $122,100 penalty against the

operator of a small, hydroelectric power project on the Pacolet River in South Carolina for violating a compliance order and the requirement of its license that it install and operate to the Commission's satisfaction certain measurement devices. Although we affirm the Commission's findings that the dam operator violated its license and the compliance order, we conclude that in numerous respects the Commission's penalty assessment does not satisfy the requirements of reasoned decisionmaking. In particular, we find that in assessing the final penalty, the Commission either did not correct for certain errors contained in the notice of proposed penalty on which the penalty was based or did not explain how it corrected for them; that the Commission failed to tailor the daily penalty to the duration of each violation; and that the Commission failed adequately to explain the nexus between the size of the penalty and the seriousness of the violation. We therefore vacate the penalty and remand to the Commission to reconsider and reduce the fine.

## I.

The petitioner, Clifton Power Corporation, operates its hydroelectric facility pursuant to a license issued by the Commission in 1986. *Clifton Power Corp.*, 35 F.E.R.C.¶ 61,303 (1986) (order issuing license). The license incorporates the terms and conditions contained in the Commission's standard Form L–12. *See id.* at 61,695 (incorporating Form L–12, Terms and Conditions of License for Constructed Minor Project Affecting the Interests of Interstate or Foreign Commerce, 54 F.P.C. 1871 (1975)). Article 6 of Form L–12 requires Clifton to install and maintain gages to monitor the water height and flow of the river on which the project is located and the level of the water contained in the reservoir of its dam, and to install and maintain devices to measure the amount of energy produced. *See* 54 F.P.C. at 1873. According to Article 6, "[t]he number, character, and location of gages, meters, or other measuring devices, and the method of operation thereof, shall at all times be satisfactory to the Commission or its authorized representative." *Id.* at 1873. Article 21 of the license requires the project continuously to discharge a mini-

mum water flow of 20 cubic feet per second. 35 F.E.R.C. at 61,697.

In 1986, shortly after the Commission issued Clifton's license, Commission officials notified Clifton by letter of its need to install stream-flow monitoring equipment. This letter began five years of Commission efforts to bring Clifton into compliance with Article 6 of its license. After numerous exchanges between Commission staff and Clifton's sole officer and shareholder, a Commission division director issued a Compliance Order on July 28, 1989 instructing Clifton to install the gages required by Article 6 and to file a plan for compliance. *See Clifton Power Corp.*, 48 F.E.R.C. ¶ 62,089 (1989) (compliance order). The Compliance Order emphasized two requirements: that Clifton's project maintain a minimum flow of 20 cubic feet per second and that it operate in a "run-of-river" mode—that is, with its outflow continuously equaling its inflow. *See id.* at 63,085. The order required Clifton to file a compliance plan within thirty days and to install the required gages within ninety days. *See id.* at 63,086. Although Clifton did not comply immediately, it did begin developing plans to comply while simultaneously appealing the Compliance Order to the Commission. After denying Clifton's appeal and its request for rehearing, *see Clifton Power Corp.*, 49 F.E.R.C. ¶ 61,305 (1989) (order denying appeals), *reh'g denied*, 52 F.E.R.C. ¶ 61,320 (1990), the Commission issued a Notice of Proposed Penalty in 1991, suggesting a fine of $200 per day running from October 26, 1989, the date by which the Compliance Order instructed Clifton to install the required gages, *see Clifton Power Corp.*, 54 F.E.R.C. ¶ 61,339, at 62,098 (1991) (notice of proposed penalty). After a hearing, an administrative law judge rejected this suggested daily penalty, which would have totaled $148,000 for 740 days of noncompliance. Instead, the ALJ assessed a penalty of $15,000. *See Clifton Power Corp.*, 65 F.E.R.C. ¶ 63,007, at 65,039 (1993) (initial decision imposing a civil penalty). Rejecting several of the ALJ's findings, the Commission imposed a penalty of $165 per day for a period of 740 days, totaling $122,100. *See Clifton Power Corp.*, 69 F.E.R.C. ¶ 61,087, at 61,344–46 (1994) (or-

der modifying initial decision and denying rehearing). The Commission denied rehearing. *See Clifton Power Corp.,* 70 F.E.R.C. ¶ 61,302 (1995) (order denying rehearing). Clifton now petitions for review.

## II.

Clifton first challenges the requirements of the July 28, 1989 Compliance Order and the Commission's findings that Clifton violated its license. It begins by arguing that the Compliance Order improperly required it to gage the dam's run-of-river mode of operation. Roughly speaking, a hydroelectric project operating in a run-of-river mode releases the same amount of water that flows into it. The Compliance Order stated, "The run-of-river mode of operation must be gaged by a continuously recording reservoir pool level gage or must be verified by all of the following: inflow records, power generation records, and minimum flow gaging records." 48 F.E.R.C. at 63,085. According to Clifton, because its license does not contain a specific provision requiring it to operate in a run-of-river mode, the Commission had no authority to require it to gage or to verify operation in this mode. On this point, the ALJ agreed, *see* 65 F.E.R.C. at 65,037–38, but the Commission reversed, pointing out that "Clifton proposed a run-of-river mode of operation in its application, and the licensing order approved that proposal." 69 F.E.R.C. at 61,-342. Although acknowledging that Clifton's license has "no special article imposing [a run-of-river] condition," the Commission concluded that Clifton "is bound to operate in that mode" because "it applied to operate in that mode." *Id.*

Section 6 of the Federal Power Act provides that all terms or conditions of a license for a hydroelectric power project must be accepted by the licensee, and the conditions and the licensee's acceptance of those conditions must be expressed in the license:

> Each such license shall be conditioned upon acceptance by the licensee of all of the terms and conditions of [the Federal Power Act] and such further conditions, if any, as the Commission shall prescribe in conformity with [the Act], which said

terms and conditions and the acceptance thereof shall be expressed in said license. 16 U.S.C. § 799 (1994). The Commission concedes that Clifton's license does not contain an explicit requirement that Clifton operate in a run-of-river mode. In fact, the license has only two references to run-of-river mode. It notes that in 1929 the dam was "designed as a run-of-the-river hydroelectric project," 35 F.E.R.C. at 61,693, and it indicates in a footnote that "[t]he project is operated on a run-of-the-river basis," *id.* at 61,697 n. 3. Although these statements are descriptive, not prescriptive, the Commission concluded that, in view of indications in Clifton's application that the dam would be operated in a run-of-river mode, it would read these statements in the license as indicating both a requirement to operate in such mode and Clifton's acceptance of that requirement. *See* 69 F.E.R.C. at 61,342. In this court, although not in its order, the Commission relies on 16 U.S.C. § 802, which requires license applicants to submit "[s]uch maps, plans, [and] specifications ... as may be required for a full understanding of the proposed project" and provides that "[s]uch maps, plans, and specifications when approved by the commission shall be made a part of the license."

■ In our view, the Commission's finding that Clifton's license includes a run-of-river requirement is neither supported by substantial evidence nor consistent with the hydroelectric licensing provisions of the Federal Power Act. Although Clifton's license application clearly stated that "[t]he project will be manually operated as a run-of-river project," and although the Fish and Wildlife Service supported Clifton's license application on the understanding that the project would operate in a run-of-river mode, Clifton's license does not expressly so require, nor does it indicate Commission approval of the materials submitted by Clifton that described the project's mode of operation as run-of-river. In contrast, Clifton's license expressly incorporates two other exhibits that Clifton submitted as part of its application, *see* 35 F.E.R.C. at 61,695, and at least forty-four other licenses issued by the Commission within a twelve-month period during which Clifton's license was issued include

specific articles requiring run-of-river operation, *see, e.g., Sven Elov Ericson,* 36 F.E.R.C. ¶ 62,374, at 63,881 (1986) (order issuing license); *Powerhouse Systems,* 33 F.E.R.C. ¶ 62,054, at 63,088 (1985) (order issuing license). Under the Commission's reasoning, a licensee would be bound to operate in a mode merely described in its license application regardless of whether the license itself specifically imposed a condition requiring operation in that mode. We cannot square such a rule with the Federal Power Act's requirement that "[e]ach ... license shall be conditioned upon acceptance by the licensee of ... such further conditions, if any, as the Commission shall prescribe ... which said terms and conditions and the acceptance thereof shall be expressed in said license." 16 U.S.C. § 799.

■ Our conclusion that Clifton's license does not require it to operate in a run-of-river mode does not settle whether it was improper for the Commission's Compliance Order to require Clifton to gage or to verify run-of-river operation. Article 6 of Clifton's license provides:

> The Licensee shall install and thereafter maintain gages and stream-gaging stations for the purpose of determining the stage and flow of the stream or streams on which the project is located, the amount of water held in and withdrawn from storage, and the effective head on the turbines; shall provide for the required reading of such gages and for the adequate rating of such stations.... The number, character, and location of gages, meters, or other measuring devices, and the method of operation thereof, shall at all times be satisfactory to the Commission or its authorized representative. The Commission reserves the right, after notice and opportunity for hearing, to require such alterations in the number, character, and location of gages, meters, or other measuring devices, and the method of operation thereof, as are necessary to secure adequate determinations.... The Licensee shall keep accurate and sufficient records of the foregoing determinations to the satisfaction of the Commission....

54 F.P.C. at 1873–74. The Commission concluded that, regardless of whether Clifton's license required it to operate in a run-of-river mode, "Article 6 requires Clifton to monitor its mode of operation to the satisfaction of the Commission." 69 F.E.R.C. at 61,342. Although we would qualify the Commission's characterization of Article 6 by reading a reasonableness requirement into it, we have no trouble concluding that the Compliance Order's instruction that Clifton gage or verify run-of-river operation was reasonable. Article 6 gives the Commission broad power to specify "[t]he number, character, and location of gages, meters, or other measuring devices, and the method of operation thereof" to the satisfaction of the Commission. The record indicates that the Clifton dam has always operated in a run-of-river mode. It is not unreasonable for the Commission to require Clifton to install devices to determine whether the dam is operating in the mode described in its license application, even if its license does not require it to operate in that mode. That Clifton's license does not require run-of-river operation may, however, bear on the reasonableness of the penalty the Commission assessed. *See infra* pp. 23–24.

Clifton next challenges the Compliance Order's requirement that it "accurately gage the minimum flow" of its hydroelectric project. 48 F.E.R.C. at 63,085. Conceding that although Article 21 of its license requires the dam to "discharge ... a continuous minimum flow of 20 cubic feet per second" of water, 35 F.E.R.C. at 61,697, and that Article 6 requires it to install devices to measure the stage and flow of the stream to the Commission's satisfaction, *see* 54 F.P.C. at 187, Clifton argues that the license does not specifically require it to measure the minimum flow. Finding this argument—that Clifton must measure its *flow* and *maintain* a minimum flow, but need not *measure* its *minimum* flow—to be wholly without merit, we uphold the Commission's conclusions that Clifton violated its license and the Compliance Order by failing timely to install the measuring devices specified in the Compliance Order.

### III.

We turn to Clifton's argument that the Commission violated its right to procedural due process. It begins by contending that the Commission failed to conduct an adequate investigation before proposing a penalty. In support of this argument, Clifton cites 16 U.S.C. § 823b(a), the provision of the Federal Power Act governing imposition of penalties, which states that "[t]he Commission shall monitor and investigate compliance with each license" and that "[t]he Commission shall conduct such investigations as may be necessary and proper in accordance with [the Federal Power Act]." As evidence that the Commission failed to conduct an adequate investigation, Clifton points out that the Commission's Compliance Order accused it of having failed to install certain gages that it had in fact installed and required Clifton to take certain actions that Commission staff admitted years later either could not or did not need to be taken.

■ We do not agree with Clifton that we must vacate the entire Compliance Order simply because of these errors. The Commission's Atlanta Regional Office inspected the Clifton project twice before the Compliance Order was issued, conducting three more inspections between 1989 and 1991. Although Clifton argues that the inspections conducted by the Commission were no more than routine inspections, rather than investigations conducted specifically for the purpose of issuing a compliance order, any such distinction is irrelevant. Nothing in section 823b(a) requires anything beyond routine investigations before the issuance of a compliance order. Even if the errors in the Compliance Order suggest that the Commission's investigations were imperfect, the statute does not create a procedural right to the invalidation of an entire compliance order simply because the Commission's investigations are inadequate with respect to certain portions of the order. Instead, the statute provides for judicial review to ensure that any penalty ultimately assessed is based only on actual violations, not on unproven allegations.

Clifton's second procedural argument is that it did not receive adequate notice of its violations prior to the issuance of the Compliance Order. Conceding that, as the Compliance Order of July 28, 1989 states, the Commission notified Clifton in six letters in 1988 and 1989 of the need to install gages to satisfy the requirements of its license, see 48 F.E.R.C. at 63,086, Clifton nevertheless argues that none of those letters mentioned Article 6. Clifton points out that it was only a seventh letter, sent on April 5, 1989, that notified the facility that it had not complied with Article 6 and that it must install gages by June 1, 1989. According to Clifton, this April 5 letter did not provide adequate time for Clifton to comply before the Compliance Order issued more than three months later on July 28, 1989.

■ Once again, Clifton's argument is without merit. Although the Federal Power Act requires the Commission to provide notice before issuing a compliance order, 16 U.S.C. § 823b(a), the April 5, 1989 letter did just that, indicating that Clifton was in violation of Article 6 of its license. Issued more than three months later, on July 28, 1989, the Compliance Order itself gave Clifton an additional ninety days to comply, see 48 F.E.R.C. at 63,086, and the penalty assessment did not take into account those ninety days. Thus, more than six months passed from the time the Commission gave Clifton notice that it was violating Article 6 of its license and the time at which penalties began accruing. We have no doubt that Clifton had adequate notice.

### IV.

Raising yet another procedural argument, Clifton contends that the Commission denied it its statutory right to have a federal district court rather than a Commission ALJ review the Notice of Proposed Penalty. The Federal Power Act provides two routes for penalty assessments and review of such assessments. See 16 U.S.C. § 823b(d) (1994). In the first route, the one followed in Clifton's case, an ALJ conducts a hearing and makes findings, the Commission assesses a penalty, and review is available in a federal court of appeals. § 823b(d)(2). In the alternate route, the Commission promptly assesses a penalty

without a hearing. § 823b(d)(3)(A). If the penalty is not paid within sixty days, the Commission may sue in a United States district court to obtain an order affirming and enforcing the assessment. § 823b(d)(3)(B). In these circumstances, the district court decides all questions of fact and law *de novo*. *Id.*

Penalty review automatically follows the first route unless a party charged with a violation requests the alternate. § 823b(d)(1). The statute requires that a notice of proposed penalty inform the charged party of its right to elect the alternate route. *Id.* The statute clearly provides, however, that the alternate route is unavailable, and thus notice about the alternate route is not required, "[i]n the case of the violation of a final order issued under [section 823b(a) ]," that is, in the case of a violation of a final compliance order such as the one issued against Clifton. § 823b(d)(2)(A); *see* § 823b(d)(1) (notice of alternate route not required). The alternate route, then, is available for violations of rules, regulations, or licenses for which the Commission has not issued a final compliance order. If the Commission issues a final compliance order instructing a party to comply with its license and the party violates that order, the party is not entitled to review by a United States district court.

Clifton acknowledges that under 16 U.S.C. § 825*l* a Commission order becomes final when the Commission transfers the record in the proceeding to a court of appeals and also that the Commission filed the record for the Compliance Order with this Court of Appeals in February 1991. Thus, when the Commission issued Clifton's Notice of Proposed Penalty a month later, on March 13, 1991, Clifton's Compliance Order, which specifically stated that it was issued pursuant to section 31(a) of the Federal Power Act—that is, 16 U.S.C. § 823b(a)—was a final order. Charged with violating a final order, Clifton was therefore not entitled to review in United States district court rather than before an ALJ.

Undeterred, Clifton further contends that the Commission deliberately and arbitrarily manipulated its proceedings to deny Clifton the right to pursue the alternate route of assessment and review. According to Clifton, to prevent it from obtaining review in federal district court, the Commission deliberately waited to issue the Notice of Proposed Penalty until after the Compliance Order became final. The Commission counters that "[i]t was logical for the [Notice of Proposed Penalty] to be issued only after the full Commission had denied rehearing of the Compliance Order" and that the Commission waited three months to issue the Notice of Proposed Penalty in order to give Clifton additional time to comply after the Commission denied rehearing. Brief for Respondent at 34. Nothing in the Federal Power Act deprives the Commission of authority to postpone penalty assessment until its findings of violations are final or to wait a brief period after a compliance order becomes final before issuing a notice of proposed penalty. For this reason, and because Clifton has provided no record support for its allegation that the Commission's actions in this case were improperly motivated, we reject Clifton's claim. Clifton's remaining procedural argument—that the Commission set it up for a violation of the Compliance Order by allowing only three months to install functional gages—is equally unpersuasive given testimony by Clifton's president that it could have complied within sixty to seventy-five days and given the years of noncompliance that followed issuance of the Compliance Order.

In its petition for review, Clifton also asks us to vacate a Commission order denying several of Clifton's requests for rehearing and granting Clifton's request that it be permitted to monitor a gage in the project's bypass only once per day. *Clifton Power Corp.*, 70 F.E.R.C. ¶ 61,242 (1995) (order on rehearing). Without challenging the substance of the Commission's rulings, Clifton asks us to vacate the order because of an allegedly incorrect statement in the order's summary of background facts, a supposedly unclear—indeed, "mystical"—reference in a footnote to a purported requirement of Clifton's license, and an allegedly incorrect statement of the reason that Commission staff took a particular action. *See* Brief of Petitioner at 25. Our role is not to edit every jot

and tittle of Commission orders. We deny Clifton's petition for review of this order.

## V.

This brings us to Clifton's numerous challenges to the size of the penalty. The Federal Power Act provides that "[i]n determining the amount of a proposed penalty, the Commission shall take into consideration the nature and seriousness of the violation ... and the efforts of the licensee to remedy the violation ... in a timely manner." 16 U.S.C. § 823b(c) (1994). The Commission has promulgated a list of eleven factors that it regards as relevant to these statutory criteria, including such considerations as the party's knowledge of the violation, its efforts to comply, and the damage, injury, or danger the violation caused. *See* 18 C.F.R. § 385.1505(b) (1995). Included among the Commission's factors is a general criterion— "[w]hether there are any other pertinent considerations." § 385.1505(b)(11). As we held in *Bluestone Energy Design, Inc. v. Federal Energy Regulatory Commission,* 74 F.3d 1288 (D.C.Cir.1996), what the Commission may properly consider under this latter catch-all category is limited by the statute; the Commission's considerations must be related to the nature or seriousness of the violation or the licensee's efforts to remedy the violation. *See id.* at 1294–95.

■ Our review of the Commission's penalty assessment is limited, governed by 16 U.S.C. § 823b(d)(2)(B), which adopts the review standards set forth in the Administrative Procedure Act. *See Bluestone,* 74 F.3d at 1294. We thus accept the Commission's findings of fact unless they are unsupported by substantial evidence on the record as a whole. 5 U.S.C. § 706(2)(E) (1994). We accept the Commission's legal conclusions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A). As part of our review under the arbitrary and capricious standard, we ask whether the agency has engaged in reasoned decisionmaking. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). In this case, we think it has not.

The Commission's Notice of Proposed Penalty suggested a fine of $200 per day for numerous alleged violations. Determining that Clifton was responsible for only some of the alleged violations, the ALJ assessed a fine of $15,000. The Commission, deciding that Clifton was responsible for more violations than those found by the ALJ but still fewer than those alleged in the Notice of Proposed Penalty, assessed a substantially higher penalty—$165 per day for 740 days, totaling $122,100.

We find several errors in the Commission's explanation of its penalty, and we are generally unable to discern from the Commission's decision how it arrived at its penalty in light of the contents of the Notice of Proposed Penalty.

### Notice of Proposed Penalty

Because a notice of proposed penalty puts a party on notice of the charges against which it must defend and the penalties that it might incur, the Commission rightly bases final penalty determinations in large part on the contents of such notices, including both the penalty amounts proposed and the factors potentially affecting the amount of the proposed penalty. In its order modifying Clifton's penalty, the Commission explained the role of a notice of proposed penalty in the determination of a final penalty assessment as follows:

> The [ALJ] properly used the notice of proposed penalty issued by the Commission as the starting point for consideration of a penalty.... [I]f the [ALJ] finds that the allegations are substantially proven, the penalty proposed in the notice should be viewed as the penalty that the Commission deems appropriate for such violations. And when [an ALJ] finds that the violations alleged in the notice have occurred, he or she should also accord substantial weight to the Commission's consideration of the factors affecting the penalty proposed in the notice.

69 F.E.R.C. at 61,344–45. The Commission's admission that a notice of proposed penalty should figure prominently in the determination of the final penalty requires that we

seriously consider Clifton's arguments that in light of certain errors in its Notice of Proposed Penalty, the ultimate fine should have been significantly lower than the $200 per day originally proposed.

Clifton points out that the Notice of Proposed Penalty charged it with numerous violations that the Commission ultimately determined it had not committed. The Notice of Proposed Penalty stated, "To date, Clifton has failed to file all required plans for the installation of gauges required under Article 6 and failed to install the required gauges." 54 F.E.R.C. at 62,097. The ALJ found, however, that Clifton had in fact installed several of the meters required by its license and that Commission staff had agreed that other meters did not need to be installed or were not feasible. 65 F.E.R.C. at 65,032–33. Having also concluded that Clifton was not required to monitor run-of-river operation, the ALJ reduced the penalty from $148,000 to $15,000. *Id.* at 65,039. On review, the Commission acknowledged that "[t]he notice of proposed penalty, on its face, described a somewhat broader scope of gaging violations than was ultimately shown in this case." 69 F.E.R.C. at 61,345. The Commission stated:

> The notice [of proposed penalty] could be read as an allegation that Clifton was in violation of Article 6 of its license by failing to install and maintain all of the gages necessary to monitor the stage and flow of the stream, the amount of water held in and withdrawn from storage, the effective head on its turbines, and its power generation. However, the Commission's staff ultimately did not require installation of an inflow gage, gages to monitor the amount of water held in and withdrawn from storage, and accepted a gage that would monitor minimum flows, but not higher stages of the river. Furthermore, Clifton had meters in place that recorded electric generation since the project began operations.

*Id.* at 61,345 n. 47. The Commission thus recognized the necessity of a downward adjustment from the penalty originally proposed. *Id.* at 61,345–46. But the Commission also explained that because "the compliance order, on which the notice was predicated, is quite specific in stating what

Clifton had to consider—how to accurately gage the minimum flow in the bypass reach, and how to verify its run-of-river mode of operation"—there was not an extreme "discrepancy between the scope of the violations cited in the notice and the violations proved at the hearing." *Id.* at 61,345.

The final daily penalty adopted by the Commission, $165, reflected a 17.5% reduction from the $200 daily penalty suggested in the Notice of Proposed Penalty. Although not offering a mathematical explanation for its reduction, the Commission explained that, despite the broader scope of violations described in the Notice of Proposed Penalty, it regarded the failure to gage minimum flows and run-of-river operation as the primary violations. We think the Compliance Order fully supports this explanation. Although the order includes general language stating that "[t]he licensee must install the gages required by article 6 [of its license] and should file a plan and schedule for the installation of the gages," 48 F.E.R.C. at 63,085, the order immediately thereafter focuses on Clifton's responsibilities to gage minimum flow and run-of-river mode of operation. The order includes two prominent captions, "Minimum Flow" and "Mode of Operation," each followed by a set-off paragraph describing Clifton's pertinent responsibilities in these areas under its license. *Id.* Accepting the Commission's explanation that these two violations were the primary focus of the Compliance Order and the Notice of Proposed Penalty, we give the Commission considerable latitude in determining the portion of the proposed penalty that these two violations comprised. Although the Commission did not explain in mathematical terms why these two violations counted for more than 80% of the originally proposed penalty, its explanation of their importance is sufficient for us to accept, at the least, the Commission's apparent conclusion that the allegations of which Clifton was cleared would not have carried a penalty greater than $35 per day, the difference between the $200 proposed and the $165 assessed.

This conclusion, however, does not necessarily mean that the Commission acted reasonably in penalizing Clifton $165 per day.

Although we reject Clifton's various arguments that the Commission failed adequately to consider Clifton's efforts to comply, in other respects we think the Commission failed adequately to explain its final penalty assessment in light of the contents of the Notice of Proposed Penalty. In particular, the Notice of Proposed Penalty included among its list of factors on which the proposed $200 daily penalty was based a Federal Power Act violation by another company of which the president of Clifton was also president. *See* 54 F.E.R.C. at 62,099. According to Clifton, the Commission may not base Clifton's penalty in part on the violations of another entity. This argument seems sound, and in view of the Commission's failure to respond to it, we take this point to be conceded. Because the Commission indicated in the Notice of Proposed Penalty that the $200 daily penalty was premised in part (however small) on this improper consideration, the Commission should reduce the final penalty accordingly.

Highlighting another problem in the relationship between the Notice of Proposed Penalty and the final penalty, Clifton argues that it was improper for the Commission to refuse to consider its inability to pay the penalty the Commission assessed. In *Bluestone,* we observed that ability to pay is not listed in the Federal Power Act as a factor that the Commission must consider in assessing penalties. *See Bluestone,* 74 F.3d at 1295. We had no need in that case to decide whether the Commission may consider this factor, *see id.,* and in the present case, neither party argues that the Commission may not consider ability or inability to pay. Clifton urges us to reverse the Commission for failing to consider Clifton's financial situation; the Commission argues that it rightfully declined to consider Clifton's inability to pay because it failed to submit adequate financial information. We again find it unnecessary to decide whether ability or inability to pay is an appropriate consideration, for we think it clear that the Commission acted arbitrarily and capriciously in Clifton's case by basing its proposed penalty on Clifton's gross revenues and then refusing to consider record evidence regarding Clifton's inability to pay.

In its Notice of Proposed Penalty, the Commission listed the statutory factors it is required to consider in setting penalties and stated, "Applying these factors, and taking into consideration the size of the project and gross annual revenues produced, a civil penalty of $200 per day for each day of violation since October 26, 1989, is proposed...." 54 F.E.R.C. at 62,098 (footnote omitted). A footnote then listed Clifton's gross revenues for several years, including "approximately $92,000" for 1990, $2,695 for 1989, $32,870 for 1988, and $60,768 for 1987. *Id.* at 62,098 n. 12. The ALJ made specific findings regarding Clifton's financial situation, listing its gross revenues for the years 1986 through 1992 (some of which differed from the amounts listed in the Notice of Proposed Penalty) and finding that Clifton's average gross annual revenue from 1986 through 1992 was approximately $60,303. 65 F.E.R.C. at 65,038. The ALJ observed, however:

> Gross revenues ... do not tell enough about Clifton's ability to pay a penalty. Gross revenues must be considered with costs. Clifton's president testified in detail, without rebuttal, that its 1992 ordinary costs were about $63,000. For previous years, Clifton's [p]resident stated that its average yearly costs were in excess of $55,860....
>
> Clifton's testimony is credible, particularly in view of the fact that Enforcement had copies of Clifton's income tax returns and did not dispute Clifton's expense figures.

*Id.* at 65,038 (citations omitted).

Despite these ALJ findings, the Commission rejected Clifton's request that it reduce the penalty in light of Clifton's claimed financial hardship. The Commission stated:

> While Clifton made claims of its inability to pay, and provided some evidence of its revenues and expenses for certain years, it failed to offer into the record any reliable documentary evidence of its financial conditions, *i.e.,* cash reserves or net corporate assets, to substantiate those claims.

69 F.E.R.C. at 61,344 n. 42. Yet later in its opinion, the Commission observed:

The notice [of proposed penalty] stated that the $200–per–day penalty was proposed, taking into consideration the size of the project and gross annual revenues produced from 1987 through 1990. The judge made findings of Clifton's annual costs, as well as its revenues for the years 1986 through 1992. These figures indicate that Clifton earned an average of $12,423 during those years.

*Id.* at 61,346. Although reciting this information, the Commission did not explain whether or how it used the information to arrive at its final penalty. The Commission simply stated:

Initially, the Commission found that $200 per day was an appropriate penalty. At this juncture, we find that a lesser amount should be assessed. Taking all these factors into account, we conclude that an appropriate penalty is $165 per day, for a total of $122,100.

*Id.* Put another way, immediately after reciting the ALJ's finding that Clifton's average net earnings from 1986 through 1992 were $12,423 per year, the Commission imposed a penalty approximately ten times that amount for violations lasting approximately two years or less. The Commission's opinion does not explain how it arrived at that figure, nor does its Order Denying Rehearing. Without drawing any conclusions of our own as to the basis of the Commission's selection of $165 as the appropriate daily penalty, we nevertheless think it suspicious given that, as Clifton pointed out to the Commission on rehearing, Clifton's president testified before the ALJ that the project's average gross revenues for the period 1986 through 1991 were $165 per day—the precise amount of the penalty the Commission imposed. *See* 70 F.E.R.C. at 61,896 n. 6.

In support of its decision not to consider Clifton's evidence regarding its finances, the Commission argues that inability to pay is an affirmative defense on which Clifton bears the burden of proof. In light of the Commission's responsibility to base its penalty assessments on substantial evidence, however, we conclude that it was arbitrary and capricious for the Commission to take into account Clifton's gross revenues while ignoring Clif-

ton's unrebutted testimony regarding its net revenues. Because the Commission never determined that Clifton had benefitted economically from noncompliance, 70 F.E.R.C. at 61,897, we presume that the Commission considered Clifton's gross revenues as a proxy for its ability to pay a penalty. But we have no idea—and the Commission has not explained—why it chose to rely on Clifton's *gross* revenues instead of its net revenues. Nor has the Commission told us exactly how it used Clifton's gross revenues. For violations of the sort at issue here, a penalty that is acknowledged to be based in part on gross revenues but that is equal to double a party's average annual gross revenues requires more explanation than the Commission offered. Furthermore, although we give the Commission considerable deference regarding evidentiary matters, we cannot discern from the Commission's orders a convincing basis for rejecting Clifton's financial evidence in light of enforcement staff's decision not to dispute Clifton's evidence at the hearing before the ALJ and the ALJ's reliance on that evidence. At the very least, having itself made Clifton's finances an issue in the Notice of Proposed Penalty, the Commission should have made it clear to Clifton at the hearing before the ALJ what sort of evidence needed to be submitted. The Commission's subsequent insistence on documentary evidence of cash reserves or net corporate assets came too late for Clifton.

■ We emphasize the narrowness of our ruling. Without expressing any view as to the general propriety of basing a penalty under the Federal Power Act on a violator's ability or inability to pay, we conclude only that it was arbitrary and capricious in this case for the Commission, having initially based its proposed penalty—which serves as the maximum penalty it may impose—on gross revenues, not to consider record evidence regarding Clifton's operating expenses and net revenues. And in view of the state of the record, we offer the Commission two cautionary suggestions. First, when assessing on remand the credibility and weight of Clifton's financial evidence, the Commission should pay attention to the ALJ's statement, never questioned by the Commission in its

orders, that the enforcement staff did not dispute Clifton's financial evidence at the hearing before the ALJ. 65 F.E.R.C. at 65,038. Second, because the Commission has not found that Clifton benefitted economically in any meaningful way from its noncompliance, if the Commission, as we suspect, cannot explain the relevance of gross revenues, and if, as seems likely, Clifton's net revenues were substantially lower than its gross revenues, then we would expect the Commission to lower Clifton's penalty substantially to take into account the differences between Clifton's gross revenues and its net revenues.

### Duration of Violations

Clifton argues that although the Commission fined it $165 per day for 740 days, only one of the violations, the failure to install a continuous recorder in the reservoir pool, lasted the full 740 days. Indeed, in its Order Denying Rehearing, the Commission acknowledged that "[t]he failure to install an acceptable minimum flow gage was cured 620 days after the compliance order's deadline, and the failure to read and record information from previously existing staff gages was cured after 528 days." 70 F.E.R.C. at 61,-897. The Commission nevertheless asserted, "We were aware of the fact that some of Clifton's violations were cured in less than 740 days, and took that into account in arriving at a total penalty of $122,100." *Id.*

■ To us, this latter statement is inexplicable. Deeming it merely an error would be charitable. In its order modifying the penalty, the Commission determined that the penalty should be "$165 per day, for a total of $122,100." 69 F.E.R.C. at 61,346. As a matter of simple arithmetic, 122,100 is the product of 165 and 740. Clearly, then, the Commission charged Clifton the full $165 penalty for 740 days. We simply cannot sustain a daily penalty that is based on a finding of multiple violations but imposed for a period longer than the duration of some of those underlying violations.

On remand, the Commission must explain which portion of Clifton's daily penalty is attributable to each violation and may not penalize Clifton for any particular violation for any period longer than its duration. We

anticipate that the Commission will significantly reduce Clifton's penalty to correct for this error. The Commission acknowledged that the failure to install a minimum flow gage lasted a full 120 days less than the period for which Clifton was penalized. The Commission's order modifying Clifton's penalty also makes clear that the failure to monitor the project's minimum flow was Clifton's most serious violation. *Id.* at 61,345. In assessing Clifton's penalty, the Commission may not ignore its own findings.

### Seriousness of Violations

■ Clifton next argues that the Commission failed adequately to take into consideration that its noncompliance caused neither harm nor potential harm to the environment or to persons or property. Clifton points out, for example, that the project's minimum flow never fell below the required 20 cubic feet per second. Although acknowledging that "Clifton's gaging violations did not endanger the environment," the Commission stated that it had not accused Clifton of endangering the environment—for example, by actually violating the license's minimum flow requirement—but rather of failing to measure and record information "so that it would no longer be necessary to speculate about whether the minimum flows were maintained, and the environment protected." 69 F.E.R.C. at 61,343. On this point, the Commission is on solid ground. In *Bluestone*, we rejected a dam operator's argument that there was no nexus between the size of its penalty and the nature or seriousness of its offenses, which consisted of "failure[s] to file documents that the Commission needed to ensure the safety of those living near the dam." *Bluestone,* 74 F.3d at 1295. We quoted with approval the Commission's explanation in another case that " '[a] dam whose safety has not been verified is a potentially dangerous dam, and the Commission regards the existence of such a potential danger as a matter of the utmost concern and seriousness.' " *Id.* at 1293 (quoting *Flambeau Paper Corp.,* 53 F.E.R.C. ¶ 61,063, at 61,203 (1990)) (alteration in *Bluestone*). Similarly, here we do not question the Commission's authority, in assessing a penalty for

failure to monitor and record data concerning the safety of a dam, to consider a violation serious even if no actual harm occurs or if the risk of harm turns out, in the end, to be slight. The Commission may regard as serious any noncompliance by an operator that deprives the Commission of information necessary to ensure the safety of a hydroelectric power project.

But this does not end the matter. Because not all harms whose risks the Commission wishes to assess are equally serious, not all failures to record or disclose information are equally serious. In some cases, the Commission will need information from dam operators to assess the risk of harm to human life. While in other cases the Commission will need information to assess the risk of major or minor environmental harms. In this case, the Commission was concerned with environmental risks related to water flow. The Commission said little about such risks, noting only in a footnote:

> A Commission staff witness stated that a failure by Clifton to release the minimum flow might result in the death of fish and aquatic vegetation from being stranded on a dry river bed; and that once Clifton resumed the normal flow, the decay of dead plants and animals would consume oxygen dissolved in the stream water, causing additional mortality to other flora and fauna downstream.

69 F.E.R.C. at 61,343 n. 40. Although the ALJ observed that "there are no studies in this record which show the impact of flows, whether high or low, on the environment, nor have any criteria been developed from which to determine whether low flows enhance or adversely affect the environment," 65 F.E.R.C. at 65,036 (citation omitted), we are willing to defer to the Commission's explanation that Clifton's license requirements were premised on the possibility that environmental harms could result from Clifton's failure to maintain its minimum flow, *see* 70 F.E.R.C. at 61,898.

█ In view of the statutory requirement that the Commission consider the seriousness of an operator's violation, however, we do not think that the Commission has adequately explained the seriousness of Clifton's

violation in relation to the amount of the penalty. In *Bluestone,* in addition to two other penalties totaling $100 per day, the Commission assessed a penalty of $100 per day for a dam operator's failure to file an independent consultant's report identifying any deficiencies in the dam or its operation that might endanger the public. *See Bluestone,* 74 F.3d at 1290–92. In that case, because a trailer home was located in the flood plain, the Commission was concerned about verifying that a dam breach would not endanger human life. *See id.* at 1291. In this case, the Commission has assessed a significantly higher penalty, $165, without any assertion that it needs to verify that Clifton's project will not endanger human life. Although we recognize that environmental damage can be serious, in this case the Commission has not described the harm whose risk it seeks to measure in terms that suggest it is anywhere near as serious as the harm at risk in *Bluestone.* While many factors quite properly enter into the Commission's selection of a penalty, we do not think that the Commission has adequately explained its choice of penalty in light of the lower penalty it assessed in *Bluestone* for a violation that thwarted the Commission's ability to assess whether a project threatened human life.

For the same reason, and in view of our earlier conclusion that Clifton's license does not require it to operate in a run-of-river mode, the Commission should also reconsider the seriousness of Clifton's failure to monitor run-of-river mode of operation. In explaining the seriousness of Clifton's failure to monitor its minimum flow, the Commission relied on the requirement in Clifton's license that it maintain a minimum flow of 20 cubic feet per second. The Commission stated that "unless or until the Commission reduces the minimum flow requirement, the 20 [cubic feet per second requirement] reflects the minimum flow judged necessary to protect environmental quality in the bypass reach." 70 F.E.R.C. at 61,898. If the Commission's reasoning is that license requirements are indicators of actions necessary to protect the environment, then the Commission's failure specifically to require Clifton to operate in a run-of-river mode may reflect the Commission's view that the degree of environmental harm whose risk Clifton's gaging violations

prevented the Commission from assessing is relatively low. Although we agree with the Commission that it may require Clifton to monitor run-of-river operation, we also agree with Clifton that the Commission must reconsider the seriousness of Clifton's failure to do so.

We have one further concern regarding the Commission's consideration of the seriousness of Clifton's violations. By instructing the Commission to consider the nature and seriousness of an operator's violation and the operator's efforts to comply, Congress seems to have intended that the Commission tailor each penalty to the circumstances of a particular operator and its violation. In this case, however, the Commission repeatedly stated that, in formulating Clifton's penalty, it intended to make an example of Clifton, that is, to deter other operators from committing similar violations. In its order modifying Clifton's penalty, the Commission stated that "a penalty of $165 per day should serve to persuade Clifton *and other licensees* that a Commission compliance order, and reasonable deadlines thereunder, cannot be disregarded with impunity even if a licensee sincerely believes that such orders are unnecessary." 69 F.E.R.C. at 61,346 (emphasis added). In denying rehearing, the Commission reemphasized, after stating that it could not "go much beyond what [it had] already said in explaining the $165 per day penalty," that it was "concerned with the effect of the penalty not only on Clifton but also on other licensees that might be tempted to delay compliance with gaging requirements." 70 F.E.R.C. at 61,897.

As we noted in *Bluestone,* Congress has specified the factors the Commission should consider in assessing penalties for hydroelectric projects. We there rejected as unreasonable the Commission's interpretation of the statutory factors as permitting consideration of the use of staff time and resources. *See Bluestone,* 74 F.3d at 1294–95. In this case, the Commission has not explained whether or how it regards deterrence of other potential wrongdoers as relevant to the statutory factors. In saying this, we certainly recognize that unlike compensating for the use of staff time and resources, deterrence of other potential wrongdoers is a traditional goal of law enforcement. We need not de-

cide here whether or how the Commission may generally consider deterrence of other operators, for we think it clear that it was not open to the Commission in this case to consider this factor.

The Notice of Proposed Penalty informed Clifton that "[t]he proposed penalty is based on analysis of the factors discussed above" and that "[t]he final penalty, if any, will be based on a reanalysis of the relevant factors and the entire record." 54 F.E.R.C. at 62,-099. The Notice of Proposed Penalty makes no mention of deterrence of other operators, and the Commission pointed to no record evidence concerning other operators that needed to be deterred from violating their licenses. One of Clifton's primary arguments on this appeal has been that the Commission failed to ensure that its final penalty assessment was commensurate with the facts and factors spelled out in the Notice of Proposed Penalty. Clifton has also argued that the penalty does not reflect the seriousness of its violation. In response, the Commission has emphasized, as it did in its orders, its need to deter other operators from violating their licenses. In view of these arguments and the Commission's own explanation in its orders of the role that a notice of proposed penalty should play, we feel it is appropriate for us to direct the Commission that, because it did not place Clifton on notice that deterrence of others would be relevant to its penalty, but rather informed Clifton that the factors it would consider would be limited to those in the Notice of Proposed Penalty, it may not on remand base Clifton's penalty even in part on this factor. Because the Commission so heavily emphasized deterrence in explaining the amount of the penalty it assessed against Clifton, we expect the Commission to reduce the penalty significantly in view of this ruling.

\* \* \*

We are mindful of our limited role in reviewing penalties under the Federal Power Act. We cannot expect the Commission to provide an explanation leading inescapably to the conclusion that its choice of penalty is somehow the "correct" one, for, as the Commission has well explained: "[I]mposition of a civil penalty is not a mathematical science. Ultimately, it reflects an element of experienced and reasoned judgment on the part of

the decisionmaker—a judgment that is reached after evaluating the totality of the evidence." *Flambeau Paper Corp.,* 53 F.E.R.C. at 61,202. That said, in this case the Commission has neither met its responsibility of reasoned decisionmaking nor considered the totality of the evidence.

We vacate Clifton's penalty and remand for the Commission to reduce the penalty consistent with this opinion and to explain more clearly its ultimate choice of penalty. In so doing, we reject Clifton's request that we determine the appropriate fine ourselves rather than remand to the Commission to reassess the penalty. Although the Commission's performance thus far in assessing Clifton's penalty causes us concern, we trust that the Commission will comply with our instructions on remand. In light of the flaws and shortcomings we have identified in the Commission's orders, we anticipate that the penalty the Commission assesses on remand will be significantly lower than the one we vacate. Clifton retains the right under 16 U.S.C. § 823b(d)(2)(B) to seek our review of the Commission's reassessment.

*So ordered.*