890 A.2d 858

**NEUTRON PRODUCTS, INC.**

v.

**DEPARTMENT OF THE ENVIRONMENT.**

No. 00074, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Jan. 27, 2006.

550

552

James D. Dalrymple, Gaithersburg, for appellant.

Debra A. Smith (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Panel: HOLLANDER, BARBERA and MEREDITH, JJ.

HOLLANDER, J.

Neutron Products, Inc. ("Neutron" or "NPI"), appellant, challenges the administrative penalty assessed by the Maryland Department of the Environment ("MDE" or the "Department"), appellee, for violations of various State regulations pertaining to the control of ionizing radiation and licenses. In particular, following an administrative hearing, NPI was found to have committed approximately 3,600 violations of license conditions and regulations, for which MDE imposed a penalty totaling $40,700.

The Maryland Radiation Act, §§ 8–101 to 8–601 of the Environment Article ("Envir.") of the Maryland Code (1996 Repl.Vol., 2004 Supp.), and Title 26 of the Code of Maryland Regulations ("COMAR"), provide authority to MDE to assure compliance with radiation laws and regulations. The penalty was imposed pursuant to Envir. § 8–510(b), which permits a penalty of up to $1,000 for each day of violation, not to exceed a total of $50,000.

Neutron sought review of the agency's decision in the Circuit Court for Montgomery County. That court affirmed in part and remanded solely to verify that the penalty did not exceed the statutory maximum of $1,000 for a single violation.

On appeal, Neutron presents the following questions:

I. By failing to explain how much of the lump sum penalty was attributable to each category of violation, and by failing to reduce the amount of the penalty in accordance with the reduction in the number of violations, did MDE abuse its discretion and arbitrarily assess a penalty?

II. By not allowing Neutron to present evidence concerning fines assessed by MDE to other Maryland licensees for the same, similar or more serious categories of violations, did the ALJ err as a matter of law?

III. In the event this court finds that MDE did not abuse its discretion by imposing one lump sum fine for numerous different violations, is Section 8–510 itself void for vagueness in that it grants unfettered and uncontestable discretion unto MDE?

For the reasons that follow, we shall affirm the circuit court.

## REGULATORY FRAMEWORK

The use and regulation of radioactive material by the private sector is governed by the Atomic Energy Act of 1954 ("AEA"), 42 U.S.C. §§ 2011—2297g–4, as amended. The AEA provides that the Nuclear Regulatory Commission may "enter into agreements with the Governor of any State providing for discontinuance of the regulatory authority of the Commission...." 42 U.S.C. § 2021(b). "During the duration of such an agreement it is recognized that the State shall have authority to regulate the materials covered by the agreement for the protection of the public health and safety from radiation hazards." *Id.*

Maryland's statutory authority to control radiation is codified in the Maryland Radiation Act (the "Act"), Envir. §§ 8–101 to 8–601, and COMAR, Title 26, Subtitle 12, which con-

cerns Radiation Management. Pursuant to the Act, certain powers, duties, and responsibilities are vested in the Secretary of the Environment and then delegated to the Director of the Air and Radiation Management Administration (the "Administration") of MDE, which is charged with regulating sources of radiation in the State. Within the Administration, the Radiological Health Program ("RHP") enforces the statutes relating to radiation control, and the regulations promulgated thereunder. *See* COMAR 26.12.01.01.

Several statutory provisions are pertinent here.

Envir. § 8–101 provides, in part:

### § 8–101. Definitions.

\* \* \*

(f) *Radiation.*—"Radiation" means:

(1) Ionizing radiation, including gamma rays, X-rays, alpha particles, beta particles, neutrons, high speed electrons, high speed protons, and any other atomic or nuclear particles or rays;

(2) Any electromagnetic radiation that can be generated during the operation of a manufactured device that has an electronic circuit; or

(3) Any sonic, ultrasonic, or infrasonic waves that are emitted as a result of the operation, in a manufactured device, of an electronic circuit that can generate a physical field of radiation.

(g) *Specific license.*—"Specific license" means a license that, under the rules and regulations adopted by the Department under this title, is effective only after the applicant files an application and the Department approves the application.

The Act grants MDE the authority to promulgate rules and regulations. Section 8–106 states:

### § 8–106. Power of Secretary to adopt rules and regulations.

(a) *In general.*—Except as otherwise provided in this section, the Secretary may adopt rules and regulations for control of sources of radiation.

(b) *Compliance with Administrative Procedure Act.*—The Secretary may not adopt any rule or regulation for control of a source of radiation unless the requirements of this section and the Administrative Procedure Act are met.

(c) *Conformity to federal standards.*—The Secretary may not adopt any rule or regulation unless the rule or regulation conforms to the relevant standards set by:

(1) The United States Nuclear Regulatory Commission;

(2) The United States Food and Drug Administration; and

(3) The United States Environmental Protection Agency.

Section 8–301 states, in part:

### § 8–301. Rules and regulations generally.

(a) *Required rules and regulations; decommissioning of facilities.*—(1) Subject to Subtitle 4 of this title, the Secretary shall adopt rules and regulations for general licenses and specific licenses that govern:

(i) Ionizing radiation sources and byproduct material;

(ii) Special nuclear material;

(iii) Devices that use ionizing radiation sources, byproduct material, or special nuclear material.

(2) The rules and regulations shall provide for:

(i) The issuance, amendment, suspension, or revocation of general licenses and specific licenses;

(ii) The registration of ionizing radiation sources for which a general license or specific license is not required. . . .

In addition, the Act authorizes MDE to issue corrective orders. Envir. § 8–503 provides:

### § 8–503. Issuance of order or notice by Department.

(a) *Generally.*—After or concurrently with the service of a complaint under this subtitle, the Department may:

(1) Issue an order that requires the person to whom it is directed to take corrective action within a time set in the order;

(2) Send a written notice that requires the person to whom it is directed to file a written report about the alleged violation in not less than 5 days from service of the order; or

(3) Send a written notice that requires the person to whom the notice is directed;

(i) To appear at a hearing before the Department at a time and place the Department sets to answer the allegations of the complaint; or

(ii) To file a written report and also appear at a hearing before the Department at a time and place the Department sets to answer the charges in the complaint.

(b) *When effective.*—Any order issued under this section is effective immediately, according to its terms, when it is served.

An order issued pursuant to Envir. § 8–503 may be contested at a hearing or become a final and enforceable order pursuant to Envir. § 8–506. It states:

**§ 8–506. Final corrective orders; issuance following notice.**

(a) *Final order.*—(1) Unless the person served with an order under § 8–503(a)(1) of this subtitle makes a timely request for a hearing, the order is a final order.

(2) If the person served with an order under § 8–503(a)(1) of this subtitle makes a timely request for a hearing, the order becomes a final corrective order when the Department renders its decision following the hearing.

(b) *Issuance following notice.*—(1) If the Department issues a notice under § 8–503(a)(2) or (3) of this subtitle, the Department may not issue an order that requires corrective action by the person to whom the notice is directed until after the later of:

(i) The time set for the hearing, if any; and

(ii) The time set for filing of the report, if any.

(2) After the time within which the Department may not issue a corrective order has passed, if the Department finds that a violation of this title has occurred, the Department shall issue an order that requires correction of the violation within a time set in the order.

(3) Any order issued under this subsection is a final corrective order and the person to whom the order is directed is not entitled to a hearing before the Department as a result of the order.

(c) *Enforcement.*—The Department shall:

(1) Take action to secure compliance with any final corrective order; and

(2) If the terms of the final corrective order are violated or if a violation is not corrected within the time set in the order, sue to require correction of the violation.

A hearing pursuant to the Act is "held in the manner provided in § 10–205 of the State Government Article for hearings in contested cases." Envir. § 8–505(a)(2). Under Envir. § 8–511, the Attorney General "shall take charge of, prosecute, and defend on behalf of this State every case arising under the provisions of this title, including the recovery of penalties."

Pursuant to Envir. § 8–508, an appeal may be taken from an adverse decision of the MDE. The statute provides:

**§ 8–508. Judicial Review of final decision of Department.**

(a) *Generally.*—Any person aggrieved by a final decision of the Department in connection with an order or license issued under this title may take a direct judicial appeal.

(b) *Procedure.*—The appeal shall be made as provided for judicial review of final decisions under Title 10 of the State Government Article.

The Act also provides for the imposition of criminal and civil penalties. Envir. § 8–509 states, in part:

**§ 8–509. Prohibited acts; penalties.**

(a) *Criminal penalty; written notice required.*—(1) A person who fails, refuses, or neglects to comply with any provision of this title, or with any regulation adopted under this title, is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $25,000 or imprisonment not exceeding 1 year or both.

(2) Before any prosecution is begun under this subsection, the Secretary shall serve written notice of each alleged violation on a person who is in charge of the place where the violation allegedly exists.

(b) *Civil penalty; injunction.*—(1) In addition to any criminal penalty imposed under this section, a person who violates any provision of this title, any regulation or order issued under this title, or any term, condition, or limitation of any license or registration certificate under this title:

(i) Is liable for a civil penalty not exceeding $10,000, to be collected in a civil action in the circuit court for any county; and

(ii) May be enjoined from continuing the violation.

(2) Each day a violation occurs is a separate violation under this subsection.

(3) Whether or not a court action has been filed, the Secretary, with the concurrence of the Attorney General, may compromise and settle any claim for a civil penalty under this section.

Of import here, Envir. § 8–510 permits MDE to assess a penalty for each violation, up to a total of $1,000 per violation, but not to exceed $50,000. The provision sets forth eight factors that must be considered with regard to the imposition of a penalty. It states, in part:

### § 8–510. Imposition of penalties by Department.

(a) *Authorized.*—In addition to any other remedies available at law or in equity and after an opportunity for a hearing which may be waived in writing by the person accused of a violation, the Department may impose a penalty for violation of any provision of this title, or any regula-

tion, order, plan for compliance, registration, certificate, or license adopted or issued under this title.

(b) *Assessment of penalty; failure to pay.*—(1) The penalty imposed on a person under this section shall be:

(i) Up to $1,000 for each violation, but not exceeding $50,000 total; and

(ii) Assessed with consideration given to:

1. The willfulness of the violation, to the extent to which the existence of the violation was known to the violator but uncorrected by the violator, and the extent to which the violator exercised reasonable care;

2. Any actual harm to human health or to the environment;

3. The nature and degree of injury to or interference with general welfare, health, and property;

4. The cost of control of the source of radiation or any emission of radiation;

5. The extent to which the location of the violation, including location near areas of human population, creates the potential for harm to the environment or to human health or safety;

6. The available technology and economic reasonableness of correcting, reducing, or eliminating the situation or condition that caused the violation;

7. The degree of hazard posed by the source of radiation or the emission of radiation; and

8. The extent to which the current violation is part of a recurrent pattern of the same or similar type of violation committed by the violator.

(2) Each day a violation occurs is a separate violation under this section.

(3) Any penalty imposed under this section is payable to this State and collectible in any manner provided at law for the collection of debts.

(4) If any person who is liable to pay a penalty imposed under this section fails to pay it after demand, the amount,

together with interest and any costs that may accrue, shall be:

(i) A lien in favor of this State on any property, real or personal of the person . . . .

COMAR 26.01.02.31 is also pertinent here. It requires that a proposed decision "shall be prepared in writing by the hearing examiner and shall contain findings of fact and conclusions of law, separately stated, and an order if appropriate."

## FACTUAL AND PROCEDURAL SUMMARY

Neutron is a Delaware corporation, founded in 1959, with its primary plant and headquarters in Dickerson, Maryland. NPI is the holder of several Maryland Radioactive Material Licenses, including License Nos. MD–31–025–01 (the "01 License"), MD–31–025–03 (the "03 License"), MD–31–025–04 (the "04 License"), and MD–31–025–05 (the "05 License")." Appellant conducts operations under these licenses at its facility in Dickerson.

Under its 01 License, Neutron engages in the manufacture, storage, distribution, sale, and use of sealed sources containing cobalt–60. Under its 03 License, Neutron manufactures and sells teletherapy sources used in the treatment of cancer. Neutron operates an irradiator (known as Dickerson II) under its 04 License. The Dickerson II irradiator is used for sterilizing medical devices, cosmetics, animal diets, spices, and other consumer and industrial products. Neutron also operates the Dickerson I irradiator under its 05 License. It is used primarily for the development of radiation processes for the production and modification of specialty polymers intended to improve the performance of consumer products, pharmaceuticals, and other health products.

In two complaints, one dated October 15, 1998, and the other dated July 9, 1999, the Administration charged NPI with regulatory violations and violations of various license conditions. In all, there were nineteen categories of alleged violations, totaling approximately 5,341 alleged violations (one for each day for each category).

The alleged violations included the following: failure to conduct all required inspections of the Limited Access Area ("LAA")[1] and required management reviews of those inspections; failure to maintain facility decommissioning records; leaving depleted uranium in an unlocked container in Neutron's parking lot, without securing it against unauthorized removal and without posting necessary warnings; failure to make available to MDE records of the irradiator operators' annual training, tests, and safety reviews; failure to conduct required emergency drills; failure to equip the irradiators with heat detectors and fire extinguishing systems; installation of a heat sensor and fire suppression system without requiring proper written certification regarding the installer's qualifications; failure to consistently maintain the conductivity level of water in the radioactive materials storage pool for the irradiators; failure to prepare proper verification of training for the user of an irradiator safety device; failure to conduct an annual review of the radiation safety program; failure to check the operation of an alarm meter before entering the irradiator; failure to update the training manual and testing to reflect current regulations; failure to properly calibrate a survey meter; and failure to timely calculate a Self Reading Dosimeter.[2]

---

1. The LAA is a restricted area within which radioactive sources are manufactured under the 01 License, and is subject to heightened safety procedures because of the presence of radioactive contamination.

2. Among other things, the Department asserted that appellant violated COMAR 26.12.01.01C.29(f), which pertains to "Financial Assurance and Recordkeeping for Decommissioning"; COMAR 26.12.01.01D.801, 802, and 904 (Security of Stored Sources of Radiation; Control of Sources of Radiation Not in Storage; Labeling Containers and Radiation Machines, respectively); COMAR 26.12.01.01X.81, pertaining to Records and Retention Periods; COMAR 26.12.01.01X.51(d)(6), pertaining to "training"; COMAR 26.12.01. 01X.31(a), captioned "Control of Source Movement"; COMAR 26.12.01.01X.27(a) and (b), pertaining to fire protection; COMAR 26.12.01.01X.63, pertaining to pool water purity; COMAR 26.12.01.01X.63; License Conditions 11(C)(1), 11E, 17, and 24 of the 04 License; License Condition 11E of the 05 License; and COMAR 26.12.01.01J.12(a)(3), regarding "Instructions to Workers."

Pursuant to Envir. § 8–505, appellant requested a hearing in regard to both complaints. The complaints were subsequently consolidated for hearing.

On November 29, 1999, MDE submitted to the Office of Administrative Hearings ("OAH") a "Motion for Partial Summary Judgment on Liability" along with a supporting memorandum and 70 exhibits. These included copies of Neutron's licenses; correspondence between Neutron and MDE; violation notices; and affidavits of Administration inspectors. Appellee also relied on the parties' Stipulations, which consisted of forty paragraphs. The parties stipulated, *inter alia*, that "Appellant has several licenses relating to the manufacture, use and distribution of sources of ionizing radiation." They also agreed as to the nature of the work performed by NPI under each license.

In support of its opposition to MDE's motion, NPI submitted 90 exhibits. These included copies of appellant's licenses; correspondence between Neutron and MDE; and an Affidavit prepared by Neutron's President, Jackson A. Ransohoff. In its brief, appellant concedes: "For the most part, Neutron did not dispute that literal violations had occurred, but argued that they did not rise to the level of finable offenses."

Focusing on the penalty, appellant complained that MDE failed to articulate how it applied the eight factors set forth in Envir. § 8–510 "in first determining whether a fine should be imposed and in then deciding the amount of the penalty that it will impose." Appellant also complained that MDE only cited the eighth factor, which considers "[t]he extent to which the current violation is part of a recurrent pattern of the same or similar type of violation committed by the violator." Envir. § 8–510(b)(ii)(8). According to NPI, "[b]y emphasizing minor infractions and treating them as serious, fineable violations, MDE is attempting to force Neutron to misallocate its resources, and in so doing, increasing rather than decreasing the likelihood of a potentially serious incident or violation."

The ALJ held a hearing on MDE's summary judgment motion on January 14, 2000.[3] On February 15, 2000, the ALJ issued an "Order on Motion for Partial Summary Judgement," granting summary judgment in favor of MDE with regard to fifteen categories of violations. In particular, the ALJ granted summary judgment with regard to all of the regulatory and license condition violations, with the exception of the alleged "violations of Condition 13.I of the 01 license (concerning Neutron's alleged failure to conduct five quarterly reviews of its monthly inspections) and Condition 17 of the 04 License (concerning Neutron's alleged defeat of electronic relay)...."

In his 28–page ruling, the ALJ determined that the complaints filed by appellee "contain[ed] the facts asserted as they specifically relate to Neutron," and the penalties imposed were "keyed to a detailed recitation of the statutory and regulatory sections applicable to each alleged violation." Regarding NPI's claim that MDE failed to adequately address the eight factors for imposition of penalties, set forth at Envir. § 8–510, the ALJ stated that the statute "does not govern the contents of MDE's administrative complaints but provide[s] authority to allow the imposition of penalties where violations are found to exist." Further, the ALJ said: "Once there has been a determination of a violation, the eight factors must then be considered prior to the actual assessment determination and application of the specific penalty." The ALJ added: "It is sufficient to only indicate a possible allowable maximum fine in the pleadings."

With regard to the imposition of a penalty, the ALJ said:

Assessing penalties is not a factual finding but the exercise of the discretionary grant of power. There is no procedural right to an explanation as to the amount of a fine/penalty as long as the amount imposed is within the authority of the agency and justified by the facts. There is only a requirement that there be a statement of reasons and rational[e] in determining whether or not to impose a fine,

---

3. No transcript of this hearing is contained in the record.

i.e. whether or not there was a violation of an applicable statute or regulation. Once that has been determined, it is within the agency's discretion to determine what sanction is appropriate as long as the sanction in within the authority of the agency.

The ALJ "reject[ed] Neutron's argument that the failure of MDE's complaint to include analysis under § 8–510 warrants a dismissal." In the ALJ's view, "the pleadings offered by MDE are sufficient to put Neutron on notice that there are alleged violations for which fines may be imposed." Moreover, the ALJ indicated that "a hearing on the merits would still be provided to determine what, if any, sanctions should be imposed as a result of the alleged violation." "Only at that point," said the ALJ, "would an analysis of § 8–510 be undertaken to determine whether a proposed fine is reasonable, appropriate, and within agency discretion."

The parties convened for an adjudicatory hearing before the ALJ in April of 2000, pursuant to the Administrative Procedure Act (the "APA"), Title 10 of the State Government Article ("S.G.") of the Maryland Code (1999 Repl.Vol.). At the hearing, appellee presented evidence of liability regarding its claim that appellant violated Condition 13.I of its 01 License, Condition 17 of the 04 License, and COMAR 26.12.01.01.-D.101[4] under its 04 and 05 Licenses. Moreover, the parties presented evidence concerning the appropriate penalty to be assessed, pursuant to the factors set forth in Envir. § 8–501(b).[5]

During the hearing the parties debated the relevance of certain evidence with regard to the appropriate penalty. Ray-

---

**4.** The Department had not sought summary judgment for this alleged violation. In a letter of November 29, 1999, accompanying the Department's motion, M. Rosewin Sweeney, Assistant Attorney General, wrote to the ALJ: "If granted, the State's motion will result in a finding of liability for all the violations asserted in the consolidated complaints except for violation of COMAR 26.12.01.01D.101."

**5.** Appellee withdrew its claim that Neutron violated COMAR 26.12.01.01.X.31.

mond E. Manley, a Radiation Physicist Supervisor at MDE, was called by NPI and testified as "an expert in the area of health physics," regarding his inspections of Neutron "since 1987." The following colloquy ensued on cross-examination:

[NPI'S COUNSEL]: Do you know of any Maryland licensees who have had situations such as those [i.e., radiation over exposure]?

[MDE'S COUNSEL]: Objection, Your Honor. If I may? I believe that where [appellant's counsel] is going—and it is a little mysterious based on the exhibit list that we were provided with—but I believe where he is headed is to try to cross examine this witness and probably other State witnesses on what enforcement actions, if any, were taken against other licensees.

And I have quite a bit of authority that I can share with you and opposing Counsel that it's simply not relevant.

One, there has been no foundation that would demonstrate why it's relevant; and, two, the State is entitled to exercise enforcement discretion. And there are a variety of cases which I can provide you copies with that say that we don't have to sue everybody who violates the law.

\* \* \*

[NPI'S COUNSEL]: [Manley] just testified that one of the factors they take into consideration in determining whether or how much to fine a licensee are fines that have been levied to other licensees in the past. That's the foundation right there. It's a fact.

[THE ALJ]: Well, examining what has relevance and what—(inaudible). The only issue in this case is whether or not any fines that are to be imposed against Neutron are justified in light of this case. What happened in other cases I'm really not too concerned with.

It is a case-by-case analysis. And if it can be shown that any fines that are to be imposed by MDE against Neutron are not arbitrarily or capriciously imposed, then that's the scope of my review here.

*I'm really not too concerned with what happened in other cases because those other cases aren't before me.*

[NPI'S COUNSEL]: Well, I understand that, but he has testified that they take that into consideration in terms of determining whether or how much to fine a particular licensee.

[THE ALJ]: I don't know that that's true.

[NPI'S COUNSEL]: And I think the amount that they are seeking has an absolute bearing on what they have fined other licensees for other violations that exceed the scope of severity of the violations at issue in this case.

[THE ALJ]: Well, it may or may not be. I think from where I sit, we're talking about apples and oranges. I don't have any other cases before me. I don't know what is at issue in some of these other cases that you're referring to.

*The only thing that I can look at today is what has been presented with regard to this case and* what fine has been proposed in this case.

As for the testimony—(inaudible)—as to what happened in this particular case, that's the only thing we're concerned about.

(Emphasis added).

Further, appellant's counsel argued:

Your Honor, ... we intend to demonstrate that the regulation of Neutron over the years has been prejudicial.

This goes to the very heart of demonstrating that fact. The fact that the way they treat other licensees is not the same way they treat Neutron Products.

And for that purpose, I believe it to be material. I believe it to be proper for me to question Mr. Manley on how they treat other licensees because their treatment of Neutron Products has been prejudicial.

The ALJ responded: "Well, again, Counsel, if any fines that are being proposed in this case are within the bounds of the law, I don't see how you can say that they're prejudicial...."

Appellant's counsel maintained that MDE had "to be able to indicate how [it] arrived" at the penalty for each violation. The following colloquy is relevant:

[NPI'S COUNSEL]: I have no idea how much is being imposed for the first violation, the second violation, the third violation—I have no idea.

[THE ALJ]: Okay, wasn't it broken down in the—

[NPI'S COUNSEL]: No, it has never been broken down.

[MDE'S COUNSEL]: But, Your Honor, he'll know when we do—that is, when you rule based on the evidence presented to you, I mean, I—it's—you're the final decision-maker and this has been briefed.

The Agency is seeking a number, and you will decide what's appropriate based on the evidence with regard to the factors. Any you—if the Agency thought $1,000 for a single day of violation was appropriate—let me give a different example.

There are five days of violation, and the Agency thought that $3,500 was appropriate for that particular kind of violation. You remain free to say, no, I'm going to go to the max on all five of these days of violation. That's your authority.

\* \* \*

[THE ALJ]: [T]he Agency has discretion in imposing a fine.

They can impose up to $1,000 a day for each violation not to exceed $50,000. All right, that's by statute.

And the State is arguing at this point that X amount of dollars be fined. That's their argument to make. You can make an argument, as well, as to what you think the fine should be.

But as long as it's within their discretion, *it doesn't have to be disclosed as to how they came up with their figure.*

It's your job to go in with your figure and convince me that your figure would be correct, as well.

(Emphasis added).

On August 17, 2000, the ALJ issued a "Proposed Decision" and "Proposed Order." He found that NPI did not violate Condition 17 of the 04 License, but otherwise found that Neutron committed seventeen other categories of license and regulatory violations, as charged. In all, the ALJ upheld over 3,600 violations, and proposed a total penalty of $40,700.

After analyzing "the appropriateness for a sanction for each set of violations including the imposition of a fine," pursuant to Envir. § 8–510, the ALJ concluded that the agency's imposition of a fine of $40,700 was "warranted." With regard to the penalty, the ALJ summarized his assessment of the eight statutory factors set forth in Envir. § 8–510:

> None of the violations cited above resulted in the catastrophic failure of the facility, any actual harm to human health or to the environment, or injury or interference with the general welfare health and property. What was apparent, however, was a carelessness of Neutron's management in overseeing its operation. There was also its failure to properly maintain records, its failure to record required training, and its failure to use equipment mandated by regulation or by license conditions. In some instances, Neutron unilaterally employed other means to reach the end that Neutron believed to best serve the public, contrary to the established regulations or license conditions. Evident throughout, however, was the constant theme that Neutron tends to regulate itself without the oversight of established regulations/conditions and tends to disregard those provisions that it sees as unduly burdensome or superfluous. As discussed above in applying the criteria in § 8–510 to the stated infractions, the potential for harm is generally and cumulatively high if Neutron continues to apply the regulations and conditions as it sees fit and fails to adhere to them strictly. The established regulations and conditions were promulgated to allow MDE to monitor

consistent and quantifiable oversight to Neutron's mechanisms in place to affect changes to the regulations and conditions but Neutron failed to follow them. Instead, the evidence showed Neutron's tendency to adhere to certain provisions in some instances and to unilaterally discard provisions of the regulations or conditions in other instances as it saw fit.

In the ALJ's view, "the imposition of a $40,700.00 fine imposed by MDE is neither arbitrary nor capricious and should be upheld here." The ALJ explained:

MDE proposed an aggregate sanction of $40,700.00. § 8–510 provides for up to $1,000 per violation and in this case 3,626 violations were upheld. MDE is also limited to a maximum fine of $50,000.00. MDE failed to provide a breakdown of its requested fine per violation and I note that nothing in the law requires it to do so. The law only states that the eight criteria are to be considered in assessing a particular fine amount for each violation. When considering that the $1,000.00 could be imposed for each violation and that MDE is requiring $40,700 for 3,626 violations, this breaks down to $11.22 per violation. As I have indicated above, some of the violations appear to be more serious than others and could reasonably command a higher sanction than the next violation. However, I must weigh all violations together and consider Neutron's overall failure to adhere to the letter of each regulation and condition especially in light of its history of noncompliance and its failure to immediately rectify infractions when initially noted by inspectors.

Appellant filed "Exceptions" to the Proposed Decision, pursuant to COMAR 26.01.02.35. First, appellant averred that the penalty of $40,700 was arbitrary and capricious because MDE and the ALJ failed to "determine an appropriate fine for each violation." Second, NPI argued that the ALJ erred as a matter of law "when he refused to require the State to break down the lump sum penalty based upon each category of violations." In addition, NPI claimed that the ALJ erred when he "refused to allow Neutron the opportunity to intro-

duce evidence that was directly relevant to its defenses being raised," such as "information pertaining to other licensees who had committed similar or more egregious violations and the amount of fine imposed in those instances." Third, appellant contended that the ALJ's Proposed Order was arbitrary and capricious because it did not "reflect that the mitigating circumstances were given any weight whatsoever." Finally, appellant excepted to instances in the Proposed Opinion in which the ALJ provided erroneous summaries of the factual background of the case. Neither party requested a hearing on the exceptions, and none was held. *See* COMAR 26.01.02.35F.

On May 15, 2003, the MDE's Final Decision Maker ("FDM") issued a 46–page "Final Decision and Order," upholding the ALJ.[6] The FDM summarized the ALJ's factual findings pertaining to each alleged violation, as well as the ALJ's conclusions of law. Further, the FDM "adopt[ed]" the "Stipulations" of the parties "as they are facts agreed to by the parties in this matter." The FDM also adopted "sixteen additional 'Findings of Fact' " set forth in the ALJ's Proposed Decision "since they are supported by the preponderance of the evidence in the record." The FDM also "adopt[ed] the Conclusions of Law" as stated by the ALJ in the Proposed Decision.

Regarding appellant's first exception, the FDM found that "[t]he determination by MDE and ALJ Wallace that a penalty amount of $40,700 should be assessed for the 3,626 violations against Neutron Products is supported by the evidence in the record, is authorized by Section 8–510, Environment Article, and, as such, is not arbitrary or capricious." The FDM stated:

> As indicated in the Proposed Decision, ALJ Wallace considered, for each category of violations, the eight factors, as required by Section 8–510, Environment Article, in deter-

---

6. According to COMAR 26.01.02.34(A), "[t]he final decision maker is not bound by the hearing examiner's proposed decision even in those cases when exceptions are not filed."

mining the appropriate penalty to be assessed against Neutron Products. MDE correctly points out that ALJ Wallace did not determine that each violation was to be assessed a fine in the amount of $11.22 per violation, rather it appears that he used this figure to indicate the reasonableness of the penalty based on the fact that there were 3,626 violations which could have been assessed a fine of up to $1,000 for each violation.

Further, citing *Cross v. United States,* 512 F.2d 1212, 1218 (4th Cir.1975), the FDM noted: "In determining whether an agency's penalty sanction is arbitrary or capricious, the court looks to whether the sanction is unwarranted or without justification in fact." The FDM explained:

The provisions of Section 8–510, Environment Article, indicate that MDE may impose a penalty of up to $1000 for each violation, but not exceeding $50,000 total, that the penalty is to be assessed with consideration given to the eight factors set forth in the law, and that each day a violation occurs is a separate violation.

According to the FDM, § 8–510 does not require MDE to "articulate the exact amount of the fine per violation ... as long as the total fine does not exceed $50,000 and the number of violations have been proved which would support the amount of the fine." Moreover, the FDM stated: "The fact that there was a reduction in the number of violations that were proved does not necessarily lead to the conclusion that the amount of the total penalty assessed should have been reduced." The FDM explained:

The assessment of a penalty amount is a discretionary function, whether performed by MDE or ALJ Wallace. As long as the amount of the penalty is within the authority of the agency to impose and justified by the facts, then ALJ Wallace could just as well have increased the amount of the fine as decreased it, given the fact that he found that 3,626 violations had been proved against Neutron Products. The law does not require that the amount of the fine must be reduced if fewer violations are proven, when, as is true in

this matter, the number of violations found by ALJ Wallace more than support the amount of the penalty assessed.

The FDM ruled: "In this case, the facts in the record support the finding of 3,626 violations, such that there is justification in fact to support the $40,700 penalty amount, based on a fine of up to $1000 for each violation." Summarizing her determinations as to appellant's first exception, the FDM said:

In conclusion, Section 8–510, Environment Article, does not require that MDE must articulate the exact amount of the fine per violation, as long as the amount imposed is within the statutory authority of the agency and justified by the facts. In this case, the evidence in the record supported the determination by ALJ Wallace that there were 3,626 violations, such that the facts supported the assessment of a penalty in the amount of $40,700, which is less than the maximum $50,000 total fine permitted by law. In assessing the amount of the penalty, ALJ Wallace considered the eight penalty factors, as required by Section 8–510, weighed all the violations together, and considered that MDE could have imposed a fine of up to $1000 per violation. He found that the imposition of a $40,700 fine by MDE was not arbitrary or capricious and should be upheld. (Proposed Decision, p. 44) The case law and the provisions of Section 8–510 do not support the argument by Neutron Products that MDE must articulate a penalty amount for each individual violation. For these reasons, Neutron Products' Exception Number 1 is denied.

Further, the FDM found that the ALJ did not err by refusing to admit into evidence "certain information concerning the fines imposed by MDE against other licensees who had committed similar or more egregious violations." Citing S.G. 10–213(d), the FDM noted that "the presiding officer in an administrative case may exclude evidence that is incompetent, immaterial, irrelevant, and unduly repetitious." Moreover, the FDM observed that NPI "sought to introduce other cases that were settled by MDE, as opposed to cases that were adjudicated in an administrative hearing," stating:

Unless the cases sought to be introduced by Neutron Products were factually similar and the penalties resulted from an adjudicatory process, then ALJ Wallace could exclude the penalties assessed in the other cases as being irrelevant or immaterial. Section 8–510, Environment Article, requires that the penalty be assessed after consideration of the eight factors set forth therein, which would suggest that the determination of the appropriate penalty amount would not easily be comparable with other cases, because the facts would not be similar. MDE's treatment of other licensees is only relevant if it is sufficiently probative of a proposition that would have legal significance to the litigation. The determination of whether evidence is relevant to a case is within the discretion of the trier of fact and the determination of ALJ Wallace to exclude the evidence in this matter must be given deference.

According to the FDM, "one of the factors to be considered ... in determining the appropriate penalty ... is 'the extent to which the current violation is part of a recurrent pattern of the same or similar type of violation committed by the violator.' " In denying the second exception, the FDM said:

[I]t was appropriate for ALJ Wallace to hear evidence concerning past violations by Neutron Products that were similar to the violations which were part of this matter, since the past violations were relevant and material to the determination by ALJ Wallace concerning the appropriateness of the penalty amount. ALJ Wallace did not abuse his discretion in refusing to hear evidence concerning penalties assessed by MDE against other violators, since it does not appear that the facts of the other cases were sufficiently similar, nor did ALJ Wallace err as a matter of law in allowing MDE to introduce evidence concerning the outcome of previous legal actions pursued by MDE against Neutron Products. For these reasons, Neutron Products' Exception Number 2 is denied.

The FDM denied NPI's third exception, concerning the ALJ's failure to consider mitigating circumstances. The FDM found that the eight factors set forth in Envir. § 8–510 did not

"list 'mitigating circumstance' as one of the factors to be considered in imposing a penalty.' " The FDM also stated: "It is clear that the Proposed Decision of ALJ Wallace is not arbitrary or capricious because it is based on substantial evidence in the record and is in accordance with the law." Further, the FDM said:

> In the Proposed Decision, ALJ Wallace did discuss each category of violations in relation to the eight factors and he considered whether the violation was mitigated because it did not meet each of the eight factors. The evidence in the record included testimony by both MDE and Neutron Products concerning the various categories of violations in relation to each of the eight factors to be considered under Section 8–510. ALJ Wallace determined that Neutron Products' failure to adhere to the letter of each regulation and condition, in light of its history of noncompliance and its failure to rectify infractions when initially noted by the ARMA [i.e., Air and Radiation Management Administration], inspectors, led to the conclusion that the $40,700 fine imposed by MDE should be upheld, especially given the number of violations proved and the fact that the fine was less than the maximum amount of $50,000.

> \* \* \*

> In the Proposed Decision, it is clear that ALJ Wallace considered the evidence in the record, including any mitigating circumstances that might have been applicable to each of the violations. However, given the fact that ALJ Wallace found that there were 3,626 violations, and that the penalty amount was less than the $50,000 maximum permitted, the determination by ALJ Wallace that Neutron Products should be fined the amount of $40,700, is not arbitrary or capricious. The provisions of Section 8–510, Environment Article, do not require that a penalty must be reduced when there may be factors present that mitigate a violation, only that MDE and ALJ Wallace must take the eight factors into consideration when determining the appropriate amount of the fine.

In addition, the FDM rejected appellant's fourth exception, in which NPI claimed that the ALJ misinterpreted the record and misstated appellant's position. The FDM explained, in part:

> After reviewing the entire record in this matter, the conclusion can be drawn that ALJ Wallace did not misinterpret the evidence in the record or mischaracterize Neutron Products' position concerning many of the violations. As pointed out by counsel for MDE, the factual findings made by ALJ Wallace in the Proposed Decision, based on the demeanor of witnesses, are entitled to substantial deference and can be rejected by the agency only if it gives strong reasons for doing so. . . . The examples given in this Exception by Neutron Products as being erroneous or hyperbole are neither, and the evidence in the record supports the determinations made by ALJ Wallace, since many of the examples cited by Neutron Products in this Exception are ones where deference must be given to the interpretation of the facts made by ALJ Wallace on the demeanor and the testimony of the witnesses.

\* \* \*

Neutron Products has also argued that ALJ Wallace mischaracterized its position, which was that, although the regulation had been violated, the underlying purpose of the regulation had not been compromised, and the consequences of the literal violation were tempered by the fact that there were other systems in place which served the same, or similar purpose, and that these facts should be taken into consideration when assessing a penalty. Neutron Products indicated that ALJ Wallace did not understand its position because he determined that "the evidence showed Neutron's tendency to adhere to certain provisions in some instances and to unilaterally discard provisions of the regulations or conditions in other instances as it saw fit." (Proposed Decision, p. 43). Again, ALJ Wallace drew reasonable inferences from the testimony and evidence in the record. The conclusion of ALJ Wallace that Neutron Products failed

to adhere to the black letter of each regulation or condition and chose to disregard those conditions and regulations, which it considered unduly burdensome or superfluous, is supported by substantial evidence in the record. ALJ Wallace may draw inferences from the evidence before him and such inferences must be given deference when based on the demeanor of the witnesses before him. There was substantial evidence in the record to support the Proposed Decision of ALJ Wallace. The inferences drawn by ALJ Wallace, based on the credibility of the witnesses, should not be reversed unless there is a strong reason for doing so, and I find that there is no strong reason to so reverse ALJ Wallace regarding these matters. For these reasons, Neutron Products' Exception Number 4 is denied.

Accordingly, the FDM affirmed ALJ Wallace's Proposed Order. As a result, a fine of $40,700 was assessed against appellant.

On June 6, 2003, appellant filed a Petition for Judicial Review in the Circuit Court for Montgomery County. However, Neutron did not challenge the agency's factual findings. At the hearing held on February 3, 2004, NPI's lawyer argued:

> I think the unique factor in this case is the lump-sum award. I think that is where all the confusion, all of the grounds of error. . . .

> \* \* \*

> I mean, the number of violations here is somewhat deceiving because that is based on the number of days that a violation was found to have existed.

> So that is kind of compounded, and it looks like a lot. There were 19 categories of violations and one fine.

> \* \* \*

> There were two cases consolidated. . . . The total [fine] implemented was $40,700.00. The problem that we have in this lump-sum award for multiple different categories of

violations is my client has absolutely no idea how much is being fined per violation or at least per category of violation, nor do you, nor does the ALJ, nor does the final decision maker.

\* \* \*

And if you take that and simply base a decision saying, well, they are within the discretion vested, it is not over $50,000.00, yes, they didn't break it down, you don't know what you were fined per violation, but they are still within that $50,000.00; therefore, it is not an abuse of discretion.

That is unreviewable. It is unreviewable because all they ever have to do is say, Your Honor, we are within the confines of the $50,000.00 cumulative sum total. We don't need to give a breakdown. They don't need to know how much they are being charged per violation. How do we challenge that?

\* \* \*

I can't think of anything that is more arbitrary than to say we have got 19 categories of violations, 3000–some–odd violations when you factor it up per day and we are going to impose a fine of $40,700.00.

Okay, can you tell me, MDE, what that is based on, what is your justification in fact for the fine. We don't have to tell you. And the ALJ says they don't have to tell you, and the final decision maker says we don't have to tell you.

Well, how do you defend that? I mean, part of the judicial review process for imposition of a sanction is arbitrary and capriciousness.

\* \* \*

[Y]ou have presented absolutely no justifications in fact for the amount of the penalty; all you have done is said we have got discretion, we are exercising our discretion, $40,000.00, and you can't challenge that because we have the discretion.

\* \* \*

It is unreviewable, and exercise of discretion cannot be made unreviewable, and I would submit to Your Honor that if you agree with MDE that they don't have to tell us the amount of the fine or that we are not entitled to put on a case . . . . [t]hat is correct. Therefore, we have no idea how much each violation or each category was fined.

We have no way to be able to argue whether it was arbitrary or capricious, in which case that inherently means we have no way to challenge it: It is unfettered discretion. And that is precisely what the ALJ said: Look, they are within their discretion, okay, so they have the discretion by Code to go up to $50,000.00.

Just because they do, does that mean that you can't challenge it? Well, that seems to be the ruling. That seems to be the ruling and if that is the state of the law and if that is what this Court believes the legislature intended, then that goes to part three of our argument, which this is unconstitutionally vague.

It doesn't give the defendant, the violator, the right of knowing precisely what it is they are being charged with.

It doesn't give them the right to a review process.

\* \* \*

It might be unconstitutional, the statute itself, and that is why I am saying if you read the statute to give them unfettered discretion, then that is unconstitutional because an agency can't have unfettered discretion; there has to be some process to be able to challenge their discretion, and simply because they exercise their discretion and they are given the right to exercise discretion doesn't mean their discretion was exercised properly, and that is what I am saying is we were never given the right to challenge that nor could we ever, without knowing how much they imposed per category, without allowing us at least the opportunity to present evidence of prejudicial treatment by introducing other fines with other people, and like I said, Your Honor, if

you agree with MDE, if you agree with the ALJ, if you agree with the final decision-maker that you can't challenge their discretion, then the statute is unconstitutional. . . .

The Department's attorney argued, in part:

[T]he Department's penalty is a recommended penalty, and so once we recommend the penalty, then it is up to the ALJ to decide whether or not that penalty is appropriate.

\* \* \*

But if you look at the ALJ's decision, the ALJ did in fact consider all of the mitigating factors and the penalty factors and considered the seriousness of the violations comparatively.

From the bench, the court concluded that the penalty was not arbitrary or capricious, and that the statute is constitutional. However, it remanded to the ALJ to determine "whether or not the statutory maximum per violation was exceeded in any single instance. . . ." The court said: "That is really what the law requires." The court reasoned:

. . . I don't think that it reaches the issue of arbitrary capriciousness except in the one regard that the law provide[s] that you may not exceed a thousand dollars per violation, and I can't measure that.

That is the problem. The law is not unconstitutional. The introduction of evidence of other fines is not troubling to me at all or the failure not to be able to—particularly in light of the fact that some of these were—if not all of them—were settlement numbers anyway.

So, I guess really the bottom line for me is this thousand dollar limit per violation and how did the ALJ make their decision that that was not violated.

I can tell the cumulative was not violated by the number, so what I would do, I think, unless you tell me otherwise, is remand and say I don't think you have to go through it violation by violation, actually; I think you can just identify the categories, and if I were the Department, I suppose I would divide $40,700.00 by 19 and get a number.

Then you are okay, but I think at this point you can't tell.

\* \* \*

I have no doubt—I personally have no doubt that the amount per violation undoubtedly did not exceed the maximum provided by law; the trouble is we can't tell from the record.

\* \* \*

They didn't put that in the statute to be idle; that has meaning, and I think the Department has to show that none of the fines exceeded the thousand dollars per violation.

Now how they do that and how they establish that record is entirely up to the Department. I am not going to direct that, but I am going to remand it back to the ALJ for further hearing on the issue of whether any particular single violation was punished by more than a thousand dollars.

\* \* \*

All right, the matter will be remanded to the Administrative Law Judge for determination of whether or not the statutory maximum per violation was exceeded in any single instance, and I will ask the State to present the order to that effect.

Accordingly, on February 23, 2004, the court issued an Order remanding the matter to the ALJ "for a confirmation that the penalty assessed against Neutron Products was no more than one thousand dollars for each day a violation occurred."

We shall include additional facts in our discussion.

## DISCUSSION

### I.

■ We review the final decision of the administrative agency in accordance with the well established principles of

administrative law. *See, e.g., Md. Aviation Admin. v. Noland,* 386 Md. 556, 873 A.2d 1145 (2005); *Bd. of Physician Quality Assurance v. Mullan,* 381 Md. 157, 165, 848 A.2d 642 (2004); *Spencer v. Md. State Bd. of Pharmacy,* 380 Md. 515, 527–29, 846 A.2d 341 (2004). The task of a reviewing court is "not to substitute its judgment for the expertise of those persons who constitute the administrative agency." *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 68, 729 A.2d 376 (1999) (quotation marks omitted). Moreover, the agency may "use its experience, technical competence, and specialized knowledge in the evaluation of evidence." S.G. § 10–213(I); *see Noland,* 386 Md. at 573 n. 3, 873 A.2d 1145 (recognizing that we give "considerable weight" to an agency's "interpretations and applications of statutory or regulatory provisions" that are administered by the agency); *Oltman v. Md. State Bd. of Physicians,* 162 Md.App. 457, 482, 875 A.2d 200 (2005).

■ On judicial review, " 'it is the *final* order of the administrative agency that is subject to deferential judicial review.' " *Carriage Hill Cabin John, Inc. v. Md. Health Res. Planning Comm'n,* 125 Md.App. 183, 220, 724 A.2d 745 (1999) (quoting *Dep't of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 296, 641 A.2d 899 (1994)); *see Gabaldoni v. Bd. of Physician Quality Assurance,* 141 Md.App. 259, 261, 785 A.2d 771 (2001) (same). Therefore, it is the decision of the FDM that is subject to review here.

*State Comm'n on Human Relations v. Kaydon Ring & Seal, Inc.,* 149 Md.App. 666, 692, 818 A.2d 259 (2003), is helpful with respect to our review of a final agency decision that follows the decision of an ALJ:

> Despite that procedural posture, it remains the agency's final decision, not the ALJ's decision, that we review for substantial evidence. Thus, "the question . . . is not 'whether the agency erred' in overruling the ALJ but whether there is substantial evidence for the agency's decision." [*Dep't of Health & Mental Hygiene v. Shrieves,*] 100 Md. App. [283,] 302, 641 A.2d 899 [ (1994) ]. More precisely, this Court's " 'job' [is] not to assess the 'rationality' of or

evidentiary basis for the ALJ's recommendation; it [is] to assess the rationality or evidentiary basis of the agency's ... final order." *Id.* at 297, 641 A.2d 899 (citing *Parker v. Sullivan*, 891 F.2d 185, 189 (7th Cir.1989), and *Drexel Burnham Lambert, Inc. v. Commodity Futures Trading Comm'n*, 850 F.2d 742, 747 (D.C.Cir.1988)).

██ While "[t]he agency itself makes factual findings," and we review the agency's decision, rather than that of the hearing examiner, the agency "is supposed to "tak[e] into consideration the factual findings made by the ALJ." *Id.* at 693, 818 A.2d 259. Moreover, "[i]n assessing the rationality and evidentiary basis for the agency's final decision ... we may take into account ... that on a cold record the agency made a decision contrary to the one the ALJ made ... upon first-hand observation of witnesses." *Id.*

██ When the ALJ makes factual findings based on an assessment of credibility, " 'the agency should give appropriate deference to the opportunity of the [ALJ] to observe the demeanor of the witnesses,' and the agency should reject credibility assessments only if it gives 'strong reasons.' " *Id.* (citations omitted). Put another way, the agency "should give substantial deference to the ALJ's credibility determinations to the extent they are critical to the outcome of the case *and* they are demeanor-based, that is, they are the product of observing the behavior of the witnesses and not of drawing inferences from and weighing non-testimonial evidence." *Id.* (citations omitted). Conversely, " '[i]f ... after giving appropriate deference to the ALJ's demeanor-based findings there is sufficient evidence in the record to support both the decision of the ALJ and that of the agency, the agency's final order is to be affirmed—even if a court might have reached the opposite conclusion.' " *Id.* at 694, 818 A.2d 259 (citation omitted). As Judge Diana Motz explained for this Court in *Shrieves*, 100 Md.App. at 303, 641 A.2d 899, "[t]his approach preserves the rightful roles of the ALJ, the agency, and the reviewing court...." *See also Berkshire Life Ins. v. Md. Ins. Admin.*, 142 Md.App. 628, 648, 791 A.2d 942 (2002); *Gabaldo-*

*ni v. Bd. of Physician Quality Assurance,* 141 Md.App. 259, 261–62, 785 A.2d 771 (2001).

██ It is also noteworthy that the assessment of a penalty is within the discretion of the administrative agency. Therefore, the agency has broad latitude in fashioning sanctions within legislatively designated limits. *See Md. Trans. Authority v. King,* 369 Md. 274, 799 A.2d 1246 (2002); *see also Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 189, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973); *Wilson v. Commodity Futures Trading Comm'n,* 322 F.3d 555, 560 (8th Cir.2003); *Panhandle Coop. Ass'n v. EPA,* 771 F.2d 1149, 1151 (8th Cir.1985).

## II.

NPI urges us to reverse "MDE's Final Decision" because "it imposes an aggregate penalty without providing a per violation breakdown." Neutron challenges MDE's "failure to specifically allocate the amount of fine for each category of violation...." In NPI's view, "the imposition of a lump sum fine" is "arbitrary and capricious." Appellant explains:

> The major issue in this case was not the literal violations, but the large fine for violations in which no radioactive material or radiation was released (or posed a credible threat of release) and no person or property was damaged (or posed a credible threat of being damaged). The principle issue was the appropriateness of assessing a penalty and, if so, the amount of that penalty.

\* \* \*

Neither the ALJ nor the FDM informed Neutron how much it was being fined for the individual violations, in the absence of which it appears that the ALJ ... has assessed the same amount for each violation, with no regard to the seriousness of any of the violations. This is beyond the authority granted by the legislature....

According to appellant, MDE abused its discretion "by failing to explain how much of the lump sum penalty was

attributable to each category of violation." Neutron adds: "When MDE assessed the original penalties for the original alleged violations, it must have had some rationale to arrive at $40,700 in order for the assessed amount not to have been arbitrary." Yet, according to appellant, "there was no rationale or evidence introduced to itemize the lump sum award in proportion to the varying degrees of severity of the alleged violations."

Claiming that "the agency must determine an appropriate fine for each category of violation," appellant asserts: "Neutron has a fundamental right to know how much penalty it is being assessed for each regulation it violated. . . ." Indeed, Neutron characterizes as "outrageous" the Department's refusal to delineate "specific amounts being imposed," claiming MDE "deprived Neutron of its right to contest the amount of each fine. . . ."

Furthermore, appellant argues that, pursuant to Envir. § 8–510, "the penalty must be '[a]ssessed with consideration given to' the eight factors. . . ." Appellant observes that "reference is always made [in the statute] to **the violation,** not to 'several violations all lumped together.' "

In addition NPI contends that the failure of appellee to provide a "nexus" between the violation and the penalty "inhibits an appellate court from making an informed decision upon review." NPI asserts that, "to permit proper judicial review of the amount (if any) of the fine, MDE or the ALJ must be able to provide the facts it relied upon to arrive at the lump sum, that is to say how much of the lump sum fine is assessed" for each category of violation.

Neutron also complains that MDE failed "to reduce the amount of the penalty" upon the reduction of the number of violations. In this regard, appellant points out that the total fine of $40,700 "was originally assessed against 19 categories of alleged violations, with the total number of alleged violations approximately 5,341," yet the final decision "upheld 17 categories of violation with a total of 3,626 violations." In NPI's view, "when more than 1700 violations are removed, and

the ALJ finds mitigating circumstances for some of the others, then the amount of the fine should be reduced according to the relative importance of the violations."

In response, MDE insists that its "imposition of an aggregate penalty of $40,700, well below the statutory maximum, for over 3,600 days of violations was not an abuse of discretion." Noting that "the administrative agency is entrusted with the authority to determine the appropriateness of the penalty within the discretion granted by the legislature," MDE maintains that "[t]he penalty assessed here is entitled to substantial deference because it was within the statutory authority of the agency to impose that penalty." MDE adds: "[N]o obligation exists on the part of the State to advise Neutron of the exact dollar amount being assessed on a daily basis for each violation."

In support of its position, MDE observes that the Department's assessment of a total fine of $40,700 constituted an average of only "$11.22 per violation." MDE also points out that "[t]he Department has in fact established 3,576 more violations in assessing a penalty of $40,700 than needed to establish imposition of the maximum total penalty under the statute." Given that "there were 3,626 violations, and only 50 violations were required to assess the maximum penalty of $50,000," MDE maintains that "the imposition of a penalty of $40,700 is well within the authority of the agency...."

Further, MDE suggests that appellant's " 'nexus' argument might be more persuasive if Neutron had not been found liable for over 3,600 violations." It states: "In view of the number of violations in this case, a penalty assessment of $40,700 is clearly within the authority of the agency." MDE asserts:

If an administrative sanction does not exceed the agency's authority and is supported by substantial evidence there can be no judicial reversal or modification of the decision based on disproportionality or abuse of discretion, unless the disproportionality or abuse of discretion was so extreme or egregious that the reviewing court can properly deem the decision to be arbitrary or capricious.

The Department also disputes NPI's claim "that it was entitled to a reduction of the proposed penalty [merely] because certain charges were dismissed." In its view, appellant "ignores the fact that Neutron was on notice that the ALJ could raise the penalty to the statutory maximum of $50,000 based on the evidence presented at the hearing."

Moreover, MDE rejects appellant's suggestion "that the ALJ found 'mitigating factors' which, combined with the reduction in days of violation, would automatically result in a reduction in the penalty imposed." According to appellee, NPI overlooks that "the ALJ found aggravating circumstances such as 'recurrent violations,' 'high potential for harm,' 'wilful' violations, a failure to 'exercise reasonable care,' and the 'wholesale disregard' of regulations and license conditions." Further, appellee contends that "the fact that a violation did not result in an injury to person or property does not mean that the violation is not serious or that a violator should not be fined for the violation."

While MDE concedes that "an administrative agency is required to make specific factual findings to support its decision that a violation occurred," it notes that "Neutron admits that MDE's decision explained the facts used to determine that violations occurred." Appellee also relies on the principle that "a reviewing court's review of an agency's imposition of a penalty is much more deferential than its review of a determination of liability."

Appellant cites *Clifton Power Corp. v. F.E.R.C.*, 88 F.3d 1258 (D.C.Cir.1996), to support its argument that the ALJ was required to specify how much of the $40,700 lump sum penalty was assessed for each category of violation. In *Clifton*, a federal agency assessed a penalty of $122,100 against the operator of an hydroelectric power project. The agency cited the operator for violating a compliance order and a license requirement that commanded the operator to install and operate certain measurement devices at its facility.

The United States Court of Appeals for the District of Columbia remanded the administrative decision for reconsid-

eration based on its finding of numerous irregularities in the penalty determination. Among other things, the court found that the agency failed to explain the nexus between the seriousness of the violation and the size of the penalty. The court said: "The Commission may regard as serious any noncompliance by an operator that deprives the Commission of information necessary to ensure the safety of a hydroelectric power project." *Id.* at 1270. However, the court explained that "not all harms whose risks the Commission wishes to assess are equally serious, not all failures to record or disclose information are equally serious." *Id.* The court concluded that the Commission failed to "adequately explai[n] the seriousness of Clifton's violation in relation to the amount of the penalty." *Id.*

The court's concern, however, stemmed from facts that are distinguishable from the instant case. The *Clifton* Court indicated that the Commission's daily penalty, $165, was arbitrary and capricious because it was erroneously based on the agency's finding of multiple violations over a period of time longer than the actual duration of some of the underlying violations. Indeed, the court stated that the Commission "may not penalize Clifton for any particular violation for any period longer than its duration." *Id.* at 1269. Moreover, given that the Commission regarded the infractions as serious enough to warrant the penalty, the court expressed concern that the Commission did not adequately explain the environmental harms that might result from the operator's infractions. The court indicated that it would "defer to the Commission's explanation that Clifton's license requirements were premised on the possibility that environmental harms could result from Clifton's failure to maintain its minimum flow." *Id.* at 1270. Nonetheless, it stated, *id.* at 1270–71:

If the Commission's reasoning is that license requirements are indicators of actions necessary to protect the environment, then the Commission's failure specifically to require Clifton to operate in a run-of-river mode may reflect the Commission's view that the degree of environmental harm whose risk Clifton's gaging violations prevented the Com-

mission from assessing is relatively low. Although we agree with the Commission that it may require Clifton to monitor run-of-river operation, we also agree with Clifton that the Commission must reconsider the seriousness of Clifton's failure to do so.

Unlike *Clifton*, there is no claim here that Neutron was penalized for some categories of violations for more days than were actually proven. Indeed, appellant does not dispute its liability for the violations in issue.

Appellant also relies on *Eastern Outdoor Advert. Co. v. Mayor & City Council of Balt.*, 128 Md.App. 494, 739 A.2d 854 (1999), *cert. denied*, 358 Md. 163, 747 A.2d 644 (2000), to support its claim that MDE erred by failing to set forth the breakdown of the aggregate penalty for each violation. This case does not advance appellant's contention.

In *Eastern*, the City of Baltimore's Board of Municipal and Zoning Appeals denied a conditional use application for the erection of a billboard. The applicant then sought judicial review in the circuit court, which affirmed. On appeal, we considered, among other issues, whether there was sufficient evidence before the Board to find that the square footage of the proposed billboard exceeded the maximum square footage allowed by the applicable zoning ordinance. In holding that the Board lacked "substantial evidence in the record to sustain [its] conclusion," we determined that "the Board's findings and the record are insufficient to permit proper judicial review." *Eastern*, 128 Md.App. at 529–30, 739 A.2d 854. Quoting from *Bucktail, LLC v. County Council of Talbot County*, 352 Md. 530, 553, 557, 723 A.2d 440 (1999), the Court explained:

> The Board's findings of fact must be meaningful and cannot be simply broad conclusionary statements. The rationale behind this principle lies in the "fundamental right of a party to a proceeding before an administrative agency to be apprised of the facts relied upon by the agency in reaching its decision and to permit meaningful judicial review of those findings." We believe the Board's "finding" that the area of the sign was 1344 square feet, and therefore not in

compliance with the Zoning Ordinance, to be a mere conclusory statement that fails to advise appellant or us of the facts used to arrive at such a decision. We have no precise idea how the Board reached its conclusion.[ ] The absence of factual findings deny appellant its fundamental right to know the reasons for the denial of the conditional use permit. "[I]t is not sufficient for the [Board] simply to express conclusions, without pointing to the facts found by the [Board] that form the basis for its contrary conclusion." We hold, therefore, that the Board's conclusion that the size of the billboard exceeded the limitations set by the Zoning Ordinance to be arbitrary, capricious, and illegal.

*Eastern*, 128 Md.App. at 530, 739 A.2d 854 (Citations omitted).

To be sure, MDE does not dispute that an administrative agency must make specific factual findings to support its finding of a violation. But, the ALJ and the FDM made detailed factual findings. Unlike *Eastern*, which addressed whether sufficient facts were presented for an agency to find the occurrence of a *violation*, appellant disputes whether the agency provided substantial evidence upon which to impose the *penalty*. In our view, the agency met that requirement.

In regard to the penalty imposed upon NPI, *Resetar v. State Bd. of Educ. of Md.*, 284 Md. 537, 399 A.2d 225, *cert. denied*, 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979), provides guidance. In that case, the Court considered a teacher's appeal from the decision of the State Board of Education to terminate the teacher's employment because of misconduct in office. In particular, Resetar was charged with referring to students using a racially derogatory term. After determining that "there was sufficient predicate for the State Board's findings of fact and that it properly found Resetar's conduct to amount to misconduct in office within the meaning of the statute," we considered whether the Board acted arbitrarily and capriciously when it sanctioned Resetar by terminating his employment. *Id.* at 562, 399 A.2d 225.

Notably, the Court said: "In reviewing the action of an administrative agency, so long as we do not find it to have

been arbitrary and capricious in the sanction imposed, we are not permitted to specify a sanction which we might have considered more appropriate." *Id.* at 563, 399 A.2d 225. The Court also stated, *id.* at 562, 399 A.2d 225:

We have further found that the State Board was not guilty of arbitrary, capricious or illegal conduct when it took the prior reprimands to Resetar into consideration in meting out punishment—any more than it would have been arbitrary if because of a teacher's prior unblemished record it concluded that such conduct warranted a punishment less than the ultimate sanction of dismissal. That leaves us with the question, however, of whether dismissal in this instance was action so harsh as to amount to arbitrary and capricious action on the part of the State Board. It is impossible to catalogue just what would or would not constitute arbitrary action on the part of an administrative agency such as the State Board in imposing sanctions, since each situation must be judged on its own facts. Certainly the agency is obliged to take the factual setting and circumstances of the misconduct into consideration, as was done here.

*King, supra,* 369 Md. 274, 799 A.2d 1246, is also helpful. In that case, the Court emphasized the discretion accorded administrative agencies with regard to sanctions. It said, *id.* at 291, 799 A.2d 1246:

The grounds set forth in [S.G.] § 10–222(h) for reversing or modifying an adjudicatory administrative decision do not include disproportionality or abuse of discretion. As long as an administrative sanction or decision does not exceed the agency's authority, is not unlawful, and is supported by competent, material and substantial evidence, there can be no judicial reversal or modification of the decision based on disproportionality or abuse of discretion unless, under the facts of a particular case, the disproportionality or abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be "arbitrary and capricious."

The recent case of *Md. Aviation Admin. v. Noland,* 386 Md. 556, 873 A.2d 1145 (2005), is also instructive. There, the Court reviewed an adjudicatory administrative decision terminating the employment of a state governmental employee. The Court discussed the "limitation upon the judicial review authority of courts, with regard to a lawful and authorised sanction, imposed by an Executive Branch administrative agency." *Id.* at 577, 873 A.2d 1145. Summarizing the standard of review that governs an administrative sanction, the Court said:

> [W]hen the discretionary sanction imposed upon an employee by an adjudicatory administrative agency is lawful and authorized, the agency need not justify its exercise of discretion by findings of fact or reasons articulating why the agency decided upon the particular discipline. A reviewing court is not authorized to overturn a lawful and authorized sanction unless the "disproportionality [of the sanction] or abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be 'arbitrary or capricious.' " *MTA v. King, supra,* 369 Md. at 291, 799 A.2d at 1255–1256. Furthermore, the employing agency does not have the burden, in the reviewing court, of justifying such a sanction. Instead, in accordance with the principle that the agency's decision is prima facie correct and presumed valid, the burden in a judicial review action is upon the party challenging the sanction to persuade the reviewing court that the agency abused his discretion and that the decision was "so extreme and egregious" that it constituted "arbitrary and capricious" agency action.

*Noland,* 386 Md. at 581, 873 A.2d 1145 (some citations omitted). *See also Spencer v. Md. State Bd. of Pharmacy,* 380 Md. 515, 846 A.2d 341 (2004) (explaining that "[a]n agency's prerogative with respect to case referral to the OAH is similar in scope to that of the agency's prerogative in determining the severity of sanctions"); *Md. State Dep't of Pers. v. Sealing,* 298 Md. 524, 539, 471 A.2d 693 (1984) (concluding that "there was substantial evidence from which a reasoning mind reasonably could have concluded" that a correctional officer's conduct

"was wantonly offensive and constituted sufficient cause for [his] removal from State service"); *Hoyt v. Police Comm'r of Balt. City,* 279 Md. 74, 89, 367 A.2d 924 (1977) (stating that "on judicial review a court may not substitute its judgment for that reached by the agency"); *Oltman, supra,* 162 Md.App. at 492, 875 A.2d 200 (affirming an ALJ's determination that a physician assistant's "prolonged conduct in forging prescriptions and receiving benefits to which he was not entitled demonstrated a lack of integrity that made him unfit to practice as a physician assistant"); *Md. State Bd. of Soc. Work Exam'rs v. Chertkov,* 121 Md.App. 574, 585, 710 A.2d 391 (1998) ("Even in cases reviewing the severity of agency sanctions for arbitrariness or capriciousness, some Maryland cases have disposed of the entire issue purely on the basis of whether the decision to impose a sanction satisfies the substantial evidence test.")

■ As we noted, pursuant to Envir. § 8–510(b), MDE is authorized to assess a penalty of $1,000 per violation, not to exceed a total of $50,000. The cases cited above lead us to agree with MDE that the assessment of an aggregate penalty of $40,700 for 3,626 violations was neither error nor an abuse of discretion. Put another way, the agency was not required to assign a particular dollar amount for each category of violation or individual violations, so long as it did not impose a fine of more than $1,000 per violation, and did not exceed the statutory cap of $50,000.

Nor do we agree with appellant that it was entitled to a reduction of the proposed penalty merely because MDE charged nineteen categories of violations, but NPI was ultimately found to have violated only seventeen categories, resulting in a substantial reduction in the total violations. The pertinent statute does not require a corresponding reduction in the penalty under such circumstances. Rather, Envir. § 8–510 provides a series of eight factors that must be considered before a penalty is imposed.

Although MDE originally assessed an aggregate penalty of $40,700 for a greater number of violations than was upheld,

FDM was entitled to determine, in light of the eight statutory factors, that the same sum should be imposed as a penalty, notwithstanding the overall reduction in the number of violations. Despite the reduced number of violations, NPI was still found to have committed thousands of violations. The ALJ recognized that "$1,000.00 could be imposed for each violation and that MDE is requiring $40,700 for 3,626 violations, [which] breaks down to $11.22 per violation." Clearly, the total fine did not exceed the maximum penalty that could have been assessed.

It appears that the ALJ and the FDM were heavily persuaded by the eighth factor, "[t]he extent to which the current violation is part of a recurrent pattern of the same or similar type of violation committed by the violator." Envir. § 8–510(b)(ii)(8). As the Court noted in *Resetar*, 284 Md. at 562, 399 A.2d 225, it is not arbitrary or capricious to consider a violator's repeat history of infractions when imposing a sanction. In imposing a $40,700 penalty, the ALJ emphasized "the constant theme that Neutron tends to regulate itself without the oversight of established regulations/conditions and tends to disregard those provisions that it sees as unduly burdensome or superfluous." The ALJ was clearly concerned that "allowing this wholesale disregard of license conditions and regulations sets a dangerous precedent and provides a recipe for future disaster." And, in the ALJ's view, "the potential for harm is generally and cumulatively high if Neutron continues to apply the regulations and conditions as its sees fit and fails to adhere to them strictly."

The FDM was mindful that "[t]he assessment of a penalty amount is a discretionary function ...," and concluded that "[t]he fact that there was a reduction in the [total] number of violations that were proved does not necessarily lead to the conclusion that the amount of the total penalty assessed should have been reduced." According to the FDM:

> As long as the amount of the penalty is within the authority of the agency to impose and justified by the facts, then ALJ Wallace could just as well have increased the amount of the

fine as decreased it, given the fact that he found that 3,626 violations had been proved against Neutron Products.

We also reject appellant's assertion that, if the agency found mitigating factors, such a finding required the agency to reduce the penalty. As the circuit court noted, Envir. § 8–510 does not provide for a reduction in penalty upon a finding of mitigating factors. Nor has appellant cited to any other pertinent statutory or regulatory provision that suggests that the agency was compelled to reduce the penalty in light of mitigating factors.

The circuit court found no basis to reject the agency's factual findings. Nor did it dispute MDE's authority to impose an aggregate penalty. However, it ordered a limited remand to assure that the ALJ did not impose a fine of more than $1,000 per violation. MDE does not challenge the limited remand.

While we do not agree with NPI's contention that the total penalty of $40,700 must be reduced, we agree with the circuit court that a remand is appropriate with respect to the narrow issue of verifying that the agency did not exceed the statutory limit of $1,000 for any one violation. Although it is evident from the fine of $40,700 that the statutory maximum penalty of $50,000 was not surpassed, it is not entirely clear whether the limit of $1,000 *per violation* was followed.[7] Consequently, on remand, the agency must make clear that it did not exceed the limit of $1,000 per violation.

### III.

At the administrative hearing, Neutron sought to introduce evidence of enforcement actions against other licensees

---

7. To illustrate, although the ALJ calculated the average fine per violation, he failed to state whether the average was indeed imposed or whether some violations were charged a greater penalty than others. The ALJ suggested that "some of the violations appear to be more serious than others and could reasonably command a higher sanction than the next violation." The FDM simply affirmed the $40,700 penalty imposed against Neutron, and did not inquire as to whether the "$11.22 per violation" was, indeed, imposed, or whether some violations were penalized more than others.

to establish the severity of the proposed fine as against NPI. The evidence that Neutron sought to introduce involved the Department's settlement of enforcement matters with other State licensees, and settlements involving the federal Nuclear Regulatory Commission ("NRC") and its licensees. The ALJ declined to allow such evidence, however.

The following colloquy is pertinent:

[APPELLANT'S COUNSEL]: Mr. Manley, are you familiar with the Irradiation Industry's Inc. incident of 1991?

[APPELLEE'S COUNSEL]: Your Honor, I would like to renew my objection. Having handled that case, I know for a fact that it was settled; and, therefore, in addition to all the reasons why you wouldn't look at other cases, it is not a case that went through full fact-finding before you or some other fact-finder here at OAH. And, therefore, the considerations in settling it really are not relevant.

[THE COURT]: If there is a settlement, I don't see how it really can be relevant.

[APPELLANT'S COUNSEL]: Because they assessed the penalty.

[THE COURT]: Well, it was a civil matter, though. It was—if it's—I don't know if it was settled at less than what was originally proposed or not. That's a different set of facts, a different set of circumstances, Counsel. I'm not sure that it's going to have any relevance here.

In his Proposed Decision, the ALJ noted that Neutron "argued that MDE is being unduly strict in applying these sanctions and argued that others similarly situated were not treated as harshly." The ALJ said:

How MDE dealt with other entities is not a matter that is before me. The fact and circumstances of other cases could very well differ from that presented in this case. I thus, can not find this argument to be persuasive.

The FDM agreed with the ALJ's analysis, stating:

Section 10–213(d), State Government Article, Annotated Code of Maryland (1999 Repl.Vol.), provides that the presid-

ing officer in an administrative case may exclude evidence that is incompetent, immaterial, irrelevant, and unduly repetitious. ALJ Wallace found that the evidence sought to be introduced by Neutron Products related to other cases was irrelevant and immaterial, and how MDE dealt with other entities was not a matter before him, because the facts and circumstances of other cases could well differ from that presented in this case, such that he did not find Neutron Products' argument on the issue to be persuasive.

Further, the FDM credited MDE's argument that Neutron improperly "sought to introduce other cases that were settled by MDE, as opposed to cases that were adjudicated in an administrative hearing." According to the FDM, "[u]nless the cases sought to be introduced by Neutron Products were factually similar and the penalties resulted from an adjudicator process, then ALJ Wallace could exclude the penalties assessed in the other cases as being irrelevant or immaterial." Noting that the eight factors set forth in Envir. § 8–510 required a case-by-case analysis, the FDM said that "the determination of the appropriate penalty amount would not easily be comparable with other cases, because the facts would not be similar."

On appeal, Neutron contends that the ALJ erred by refusing to admit information pertaining to penalties assessed against other licensees for regulatory violations. Appellant complains that the ALJ should have allowed Neutron "to present evidence concerning fines assessed by MDE to other Maryland licensees for the same, similar, or more serious violations. . . ." In NPI's view, the agency "denied Neutron the use of one of its most important defenses, and thereby denied Neutron of its right to due process."

According to NPI, "MDE officials could decide that they simply want to fine a licensee out of business because they did not like licensee management, and the licensee would have no recourse in the judiciary." Neutron also asserts: "Many regulatory agencies throughout the country attempt to treat all of their licensees consistently and, in order to support that

effort, have established guidelines which address appropriate levels of fines for various types of violations." Yet, says Neutron, the ALJ "prevented [it] from using the argument that it was regulated in a prejudicial manner (when compared with how MDE treats other licensees), and prevented Neutron from introducing evidence to support that claim because '[t]he fact and circumstance of other cases could very well differ from that presented in this case.' " NPI adds: "It is Neutron's responsibility to ensure that the examples it uses are relevant, and it is the jurist's responsibility to accord them proper weight."

Further, appellant observes that "the ALJ was not consistent in his application of his misguided attempt to limit the scope of the hearing." In particular, appellant complains that the ALJ "permitted the introduction of previous legal actions pursued by MDE against Neutron and relied on their application in his Proposed Decision." Although appellant "does not dispute the relevancy of past legal matters between Neutron and MDE," it "submits that MDE's treatment of other licensee's [sic] is equally relevant and the ALJ's refusal to allow Neutron to use this evidence as a component of its defense constitutes reversible error." According to Neutron, it "was prepared to present examples in which other licensees actually did put members of the public at risk and/or inflict bodily harm on individuals (none of which Neutron did), and for which the penalty imposed by MDE was either $0, or not nearly as severe."

In response, MDE renews the arguments advanced below. It asserts that "[t]he evidence that Neutron attempted to introduce involved the Department's settlement of enforcement matters with other State licensees and settlements involving the [NRC] and its licensees." MDE points out that the "NRC is an independent federal agency with its own penalty statute and enforcement process," and the "NRC's settlement and/or adjudication of cases under its penalty statute has absolutely no relevance to an enforcement action by a state agency involving a different statute and different penalty factors."

Noting that "[t]he determination of whether evidence is relevant is within the discretion of the trier of fact," MDE also argues that "[t]he ALJ properly declined to admit this evidence on relevance grounds." It contends that the ALJ was entitled to conclude that "evidence of settlements with other licensees were not relevant or material to the Department's enforcement action against Neutron." On that basis, says MDE, the ALJ "properly declined to allow it."

Further, MDE maintains that "[a] decision to settle a case is fact specific and necessarily involves the consideration of many factors, which may have no relevance at all to any other case." In the Department's view, "[i]t is impossible to compare an adjudicated enforcement action to a case that has been settled." Appellee explains: "A settled case, unlike an adjudicated case, has not been through a fact-finding hearing on the record, before an administrative judge." Therefore, insists appellee, "there is no way to know all of the facts in the cases that were settled, or what considerations led to the penalty assessment."

With respect to NPI's claim that it was "treated in a prejudicial manner because other licensees were not prosecuted or fined for similar violations," MDE argues that "there is no due process requirement that directs the Department to prosecute all violators that commit similar violations." Appellee contends that appellant "has not alleged, nor can it, that the Department's decision to take enforcement action against Neutron and not against others was based upon an unjustifiable or arbitrary standard."

*Montgomery County v. Anastasi,* 77 Md.App. 126, 549 A.2d 753 (1988), on which NPI relies, is pertinent. In *Anastasi,* seventeen members of the Montgomery County Police Department filed a complaint with the Montgomery County Merit System Protection Board, challenging the legality of the promotion procedures followed by the police department. In particular, they "alleged that the Department violated the law when during their promotion process they considered information on some of the candidates which was not provided for in

the Department's announced procedures...." *Id.* at 128, 549 A.2d 753. After the Board upheld the procedures, the employees sought judicial review in the circuit court, which reversed.

On appeal, we considered whether "the County Charter and Code impose legal constraints on the Department's ability to factor into the selection procedure the additional sources which the Chief utilized in making the promotional selections ... and whether those additional constraints, if any, have been violated." *Id.* at 133, 549 A.2d 753. We cited to a prior ruling issued by the Board that "addressed the use of 'irrelevant personnel records' in the Department's promotion process and the use of additional persons in the final selection process where there were no guidelines or standards to assure fairness and consistency of review and selection." *Id.* We "accord[ed] considerable deference to the conclusions reached in that case." *Id.* at 133–34, 549 A.2d 753.

While the Board declined to follow *Anastasi,* this Court agreed with the circuit court that the prior ruling was "indistinguishable." *Id.* at 138, 549 A.2d 753. We said: "In rendering opposite decisions based on indistinguishable facts, without adequately explaining the basis for doing so, the Board has exercised [its] authority in an arbitrary manner...." *Id.* at 138–39, 549 A.2d 753.

According to Neutron, *Anastasi* supports its assertion that it should have been allowed to introduce evidence of appellee's prior settlements with other radioactive materials licensees. MDE disagrees, claiming that *Anastasi* "is inapplicable." We agree with MDE that *Anastasi* is distinguishable, because the employees in that case claimed that the Board deviated from a prior ruling, but no such claim is advanced here.

Neutron also relies on *United States v. Ekco Housewares, Inc.,* 62 F.3d 806 (6th Cir.1995). In *Ekco,* the United States brought an action against the operator of a hazardous waste disposal facility for failing to comply with regulatory financial responsibility requirements under the Resource, Conservation and Recovery Act, 42. U.S.C. §§ 6901–6987. The federal

court assessed a civil penalty of $4,606,000 against the operator, who appealed. In the Sixth Circuit, Ekco argued, among other things, that "the court abused its discretion in imposing a penalty significantly higher than penalties imposed against other owners/operators for similar violations." *Ekco*, 62 F.3d at 816. The Sixth Circuit recognized that "penalties imposed in other cases are indeed relevant," but noted that "[t]he reasonableness of a penalty . . . is a fact-driven question, one that turns on the circumstances and events peculiar to the case at hand." *Id.* Moreover, the court found that "the decisions relied upon by Ecko do not provide meaningful guidance." *Id.* Accordingly, it rejected Ekco's claim that the lower court abused its discretion in assessing the penalty.

We agree with the FDM and MDE that *Ekco* is distinguishable.[8] NPI sought to admit evidence of MDE's prior settlement with another licensee, as well as other matters involving the NRC, a federal regulatory agency. Similarly, the federal court in *Ekco* concluded that the cases presented by Ekco were not analogous, because they involved operators "at the earliest stages of the enforcement process," which had not committed the long-term violations that Ekco had. *Ekco*, 62 F.3d at 817.

In our view, a case that settles does not necessarily have a recorded fact-finding process. Therefore, a court cannot ascertain all of the facts pertinent to the settlement agreement, or the considerations involved in the penalty assessment. As MDE points out:

> A decision to settle a case is fact specific and necessarily involves the consideration of many factors, which may have

---

8. In distinguishing *Ekco Housewares, Inc.*, on which NPI relied below, the FDM said, in part:

> While Neutron Products argued that the *Ekco* case was applicable to the issue of mitigation, this case is not similar, because the provisions of Section 8–510, Environment Article, are to be used to determine whether the penalty amount should have been mitigated. In addition, the *Ekco* case stands for the proposition that the reasonableness of a penalty is a fact driven question, and one that turns on the circumstances and events peculiar to the case. (*Ekco*, at p. 816).

no relevance at all to any other case. It is impossible to compare an adjudicated enforcement action to a case that has been settled. As the ALJ correctly noted at the administrative hearing, it is like comparing apples and oranges. (E.21). A settled case, unlike an adjudicated case, has not been through a fact-finding hearing on the record, before an administrative judge. Thus, there is no way to know all of the facts in the cases that were settled, or what considerations led to the penalty assessment. The ALJ ... properly concluded that evidence of settlements with other licensees were not relevant or material to the Department's enforcement action against Neutron.

Appellant's reliance on *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir.1988), is also misguided. In *Sterling*, a class action lawsuit was brought against a chemical corporation for personal injuries and property damage sustained by residents who lived near the corporation's chemical waste burial site. The federal trial court entered judgment in favor of the plaintiffs on legal theories of strict liability, common law negligence, trespass, and nuisance. It "awarded five representative members of the class compensatory damages for their personal injuries, as well as property damages, plus prejudgment interest on the entire award." *Id.* at 1192. In addition, the court awarded punitive damages to the class. The corporation appealed.

Among other issues, the Sixth Circuit reviewed the compensatory damage award. In particular, it considered the corporation's claim of excessiveness. The court noted that, "[w]hen considering whether an award is so excessive, this court considers other awards in other cases, as well as the nature and extent of the injuries." *Id.* at 1207. Upon reviewing a similar case that awarded less compensatory damages for similar injuries, the court concluded that the district court's award was excessive.

The instant case does not involve a damage award, however. Instead, Neutron was subject to a civil penalty. Consequent-

ly, the standard imposed by the *Sterling* Court is inapplicable here.

To buttress its contention that there are no due process requisites that obligate MDE to prosecute all violators that commit similar violations, MDE relies on *Consumer Prot. Div. v. Consumer Publishing Co., Inc.*, 304 Md. 731, 501 A.2d 48 (1985). In that case, the Division charged that the company's "advertisements offering pills for sale in Maryland contained false and misleading statements in violation of the Maryland Consumer Protection Act." *Id.* at 738, 501 A.2d 48. An administrative hearing was conducted, resulting in a cease and desist order against the company, which required the company to provide "affirmative disclosures in future advertising," and to reimburse the Maryland residents who bought the product during the time that the false advertising was used. *Id.* at 740, 501 A.2d 48.

The company sought judicial review in the circuit court, which "vacated the Division's final order and substituted a new order allowing the Division to enforce the terms of an agreement which had been entered between the Company and the United States Postal Service." *Id.* at 740–41, 501 A.2d 48. The court also found that the company's "constitutional rights under the First Amendment and the Fourteenth Amendment had been violated and that 'the record is insufficient to support a factual basis for the rejection of the [Company's] exceptions.' " *Id.* at 741, 501 A.2d 48. The Division appealed.

On review, the Court considered, among other issues, the company's contention that the circuit court's decision should be upheld because " '[t]he Division improperly targeted the Company for Selective Enforcement proceeding[s],' " in violation of the company's rights under the Equal Protection Clause of the Fourteenth Amendment. The Court concluded that, even if the company established "that substantially similar claims had been made by many other companies marketing ... diet pills in Maryland and that the Division had not proceeded against those other companies, the Company's

equal protection argument is nevertheless without merit." *Id.* at 751, 501 A.2d 48.

The Court observed that "the conscious exercise of some selectivity in enforcing a statute fair on its face does not in and of itself amount to a constitutional violation." *Id.* at 751, 501 A.2d 48. Quoting *In re Laurence T.,* 285 Md. 621, 628, 403 A.2d 1256 (1979), the Court explained that, "to establish a violation of the Fourteenth Amendment's Equal Protection Clause, the company must prove that the Division's selective enforcement 'was deliberately based' upon an unjustifiable standard or arbitrary classification,' " which the company failed to do. *Id.* at 751, 501 A.2d 48.

Here, Neutron has not claimed that MDE's decision to charge Neutron with violating pertinent regulations and license conditions was based on an unjustifiable or arbitrary standard. Instead, Neutron argues that the ALJ should have admitted evidence to compare the penalties assessed against Neutron with penalties assessed in similar matters before MDE. We need not resolve the issue presented by Neutron on constitutional grounds. *See Murrell v. Mayor & City Council of Baltimore,* 376 Md. 170, 191 n. 8, 829 A.2d 548 (2003); *Jordan v. Hebbville,* 369 Md. 439, 461 n. 20, 800 A.2d 768 (2002) ("[T]his Court adheres to the established principle that a court will not decide a constitutional issue when a case can properly be disposed of on a non-constitutional ground."); *Telnikoff v. Matusevitch,* 347 Md. 561, 579 n. 15, 702 A.2d 230 (1997) (noting "the established principle that a court will not decide a constitutional issue when a case can properly be disposed of on a non-constitutional ground").

Because the ALJ was not persuaded as to the factual similarity of the cases offered for comparison, and given the wholly disparate procedural postures of the cases, the ALJ, in his discretion, appropriately rejected Neutron's request to present evidence of prior settlement agreements with radioactive licensees. Appellant's claim that it should have been allowed to present evidence of penalties in matters that were settled does not warrant reversal. The flip side is also true.

Had the agency been willing to consider such evidence, we are satisfied that MDE could not be heard to complain, because of the wide discretion afforded to the fact-finder in regard to relevancy determinations. The agency's decision to exclude such evidence, based on relevance, was neither erroneous nor an abuse of discretion.

## IV.

Finally, appellant argues that if this Court determines that MDE had the discretion to "impos[e] one lump sum fine for numerous different violations," then Envir. § 8–510 is "void for vagueness in that it grants unfettered and uncontestable discretion unto MDE." Appellant asserts:

> If, in fact, Section 8–510 grants MDE the authority to impose an arbitrary lump sum fine for multiple violations of differing natures and severity levels, then it is literally impossible for any Licensee to ever challenge, and any finder of fact to reverse, the imposition of the amount of the fine for any one of the multiple violations cited.

According to NPI, "the authority granted to MDE to impose a fine was intended to apply to separate, individual violations." Neutron asserts: "This interpretation gives meaning to the statute and allows for constitutionally mandated checks and balances of MDE's exercise of discretion by requiring specificity regarding the fine being imposed for each violation." Further, appellant contends that "the interpretation applied by MDE, the ALJ, and the Final Decision Maker below renders the statute void for vagueness."

In addition, Neutron argues:

> It is not difficult to ascertain why MDE interprets Section 8–510 so as to allow it the authority to impose lump sum fines: the answer is found in the very root of the inherent problem with the statute as interpreted by MDE, namely that it vests unto MDE unfettered and uncontestable discretion.

Appellant adds:

While Neutron does not believe that the Legislature intended to grant the unfettered and uncontestable discretion to impose lump sum fines as it has in this case, if that in fact was the intent, the statute is unenforceable as being unconstitutionally vague by welcoming the inherent danger of arbitrary enforcement.

Further, appellant argues that, "if MDE is vested with the discretion of imposing a lump sum fine for multiple violations, it is impossible for it to establish the basis of that fine for each separate violation based upon the eight factors required in Section 8–510." In NPI's view, MDE's "interpretation renders nugatory the eight [statutory] factors which must be considered, and ultimately explained, when MDE imposes a fine for 'a violation.' "

MDE counters that § 8–510 "is not void for vagueness." It explains: "Statutes are generally presumed to be constitutional and they should not be declared otherwise unless the repugnancy is clear." Moreover, appellee avers that "[c]ourts should avoid declaring a statute invalid if there is some less drastic way of deciding the case." Further, it notes that "[t]he party attacking the statute has the burden of establishing its unconstitutionality," and it claims that appellant failed to meet its burden.

According to appellee, "[i]t is a well established principle that the delegation of legislative power to executive branch agencies or officials does not violate constitutional separation of powers as long as sufficient safeguards are included in the statute." It adds: "[T]he delegation of authority to an administrative agency to assess a penalty is not an unconstitutional delegation of authority." Further, appellee maintains: "The fact that the statute also gives the Department the discretion to determine the penalty within legislatively mandated limits does not render the legislation unconstitutional."

Appellee points out that "the penalty statute at issue here authorizes the Department to assess a penalty for regulatory violations and provides specific factors that the Department must consider in determining the penalty." According to

MDE, "the Department's radiation regulations were promulgated in order to protect the health and safety of workers and Maryland's citizenry, and as such the Department is entitled to some latitude in the exercise of its discretion." MDE also suggests that "Neutron's real contention appears to be the fact [that] the ALJ rejected its challenge to the penalty, finding that the evidence of record supported the imposition of the proposed penalty." In its view, that does not amount to a constitutional violation.

Traditionally, "[t]he void-for-vagueness doctrine as applied to the analysis of penal statutes requires that the statute be 'sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.' " *Galloway v. State*, 365 Md. 599, 614, 781 A.2d 851 (2001), *cert. denied*, 535 U.S. 990, 122 S.Ct. 1547, 152 L.Ed.2d 472 (2002) (citation omitted). "The void for vagueness contention finds conceptual nourishment in the Fourteenth Amendment's guarantee of procedural due process." *Finucan v. Md. Bd. of Physician Quality Assurance*, 380 Md. 577, 591, 846 A.2d 377, *cert. denied*, 543 U.S. 862, 125 S.Ct. 227, 160 L.Ed.2d 103 (2004). As the Court of Appeals has explained:

> "It is a basic principle of due process than an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit

the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked.' "

*Galloway*, 365 Md. at 614–15, 781 A.2d 851 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972))(alterations in original)(some internal quotation marks omitted).

 Generally, courts apply two criteria to determine whether a statute is void for vagueness. *Williams v. State*, 329 Md. 1, 8, 616 A.2d 1275 (1992); *Eanes v. State*, 318 Md. 436, 459, 569 A.2d 604, *cert. denied*, 496 U.S. 938, 110 S.Ct. 3218, 110 L.Ed.2d 665 (1990); *Bowers v. State*, 283 Md. 115, 120–21, 389 A.2d 341 (1978). First, a court must determine whether the statute complies with the "fair notice principle." *Id.* at 121, 389 A.2d 341. In discussing the fair notice principle, the Court of Appeals has held that "[d]ue process commands that persons of ordinary intelligence and experience be afforded a reasonably opportunity to know what is prohibited, so that they may govern their behavior accordingly." *Id.* To determine whether a statute provides fair notice, a court considers "whether persons 'of common intelligence must necessarily guess at [the statute's] meaning.' " *Williams*, 329 Md. at 8, 616 A.2d 1275 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 607, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). A statute is not vague under the fair notice principle if the meaning "of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess a common and generally accepted meaning." *Bowers*, 283 Md. at 125, 389 A.2d 341 (citations omitted); *see Eanes*, 318 Md. at 460, 569 A.2d 604.

 Second, a statute may be stricken for vagueness if it does not "provide legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws." *Bowers*, 283 Md. at 121, 389 A.2d 341. To

survive the application of the second criterion, a statute must "eschew arbitrary enforcement in addition to being intelligible to the reasonable person." *Williams*, 329 Md. at 9, 616 A.2d 1275. A statute is unconstitutionally vague when it "is so broad as to be susceptible to irrational and selective patterns of enforcement...." *Bowers*, 283 Md. at 122, 389 A.2d 341. But, a statute is not void for vagueness "merely because it allows for the exercise of some discretion." *Id.*

"As a general rule, the application of the void-for-vagueness doctrine is based on the application of the statute to the 'facts at hand.'" *Galloway*, 365 Md. at 616, 781 A.2d 851 (quoting *Bowers*, 283 Md. at 122, 389 A.2d 341). Consequently, "it will usually be immaterial that the statute is of questionable applicability in foreseeable marginal situations, if a contested provision clearly applies to the conduct of the defendant in a specific case." *Bowers*, 283 Md. at 122, 389 A.2d 341.

Maryland courts have applied the void for vagueness doctrine to civil penalties. *See, e.g., Finucan*, 380 Md. at 591, 846 A.2d 377 (2004) (applying the void for vagueness analysis to regulations imposing sanctions on physician); *Blaker v. State Bd. of Chiropractic Examiners*, 123 Md.App. 243, 257 n. 3, 717 A.2d 964 (1998) (applying void for vagueness analysis to regulations imposing sanctions on licensed chiropractor); *Tidewater/Havre De Grace, Inc. v. Mayor and City Council of Havre de Grace*, 337 Md. 338, 653 A.2d 468 (1995) (applying void for vagueness analysis to local tax ordinance). However, "where a statute imposes criminal penalties, the standard is certainly higher" than the standard applicable to statutes imposing only civil penalties. *Kolender v. Lawson*, 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

We are satisfied that the statute is not void for vagueness. We explain.

Appellant's argument focuses on the second criterion, *i.e.*, that the provision may be stricken for vagueness if it does not "provide legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal

laws." *Bowers,* 283 Md. at 121, 389 A.2d 341. In our view, the statute provides adequate guidelines for MDE to enforce and apply. The discretion afforded by the Legislature to MDE to apply the eight enumerated factors is reasonable. It is not so broad as to be susceptible to irrational and selective patterns of enforcement. Moreover, the delegation of authority to an administrative agency to assess a penalty is not an unconstitutional delegation of authority. *See Lussier v. Md. Racing Comm'n,* 343 Md. 681, 691, 684 A.2d 804 (1996)(finding regulation authorizing State Racing Commission to impose monetary penalty valid in light of statutory purpose requiring the Commission "to sanction misconduct in connection with racing").

■ Indeed, "delegations of legislative power to executive branch agencies or officials ordinarily do not violate the constitutional separation of powers requirement as long as guidelines or safeguards, sufficient under the circumstances, are contained in the pertinent statute or statutes." *Christ v. Md. Dep't of Natural Res.,* 335 Md. 427, 441, 644 A.2d 34 (1994)(citing *Judy v. Schaefer,* 331 Md. 239, 263, 627 A.2d 1039 (1993)); *see Md. State Police v. Warwick,* 330 Md. 474, 480–81, 624 A.2d 1238 (1993); *Dep't of Transp. v. Armacost,* 311 Md. 64, 72, 532 A.2d 1056 (1987). "Moreover, the requirement of guidelines is not an absolute one; it has been relaxed in many circumstances in light of the complexity of modern conditions with which government must deal." *Christ,* 335 Md. at 441, 644 A.2d 34.

The Legislature accorded MDE the necessary discretion to protect the health and safety of workers and the public from radiation exposure. The Court of Appeals has said:

> [W]here the discretion to be exercised relates to ... regulations for the protection of public morals, health, safety, or general welfare, and it is impracticable to fix standards without destroying the flexibility necessary to enable the administrative officials to carry out the legislative will,

legislation delegating such discretion without such restrictions may be valid.

*Pressman v. Barnes,* 209 Md. 544, 555, 121 A.2d 816 (1956).

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. CASE REMANDED TO MDE FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 50% BY APPELLANT AND 50% BY APPELLEE.**